CITIZENS NATIONAL BANK IN ABILENE V. TEXAS & PACIFIC RAILWAY COMPANY ET AL.

No. 7580. Decided March 19, 1941.
Rehearing Overruled May 14, 1941.
(150 S. W., 2d Series, 1003.)

*Smith & Eplen,* of Abilene, for plaintiff in error.

It appearing that the provision in a contract between a contractor and a railroad company that said railroad company would make final payment to the contractor after he had furnished written evidence that he had paid in full all labor and materialmen, was for the sole benefit of the railway company, intervenors had no rights thereunder and having no valid rights to present, the trial court did not err in recognizing an assignment made by the contractor to the bank as prior and superior so as to entitle it to judgment against the railroad company for the balance of the funds due the contractor. Modern Plumbing Co. v. Armstrong Bros. 36 S. W. (2d) 1011; National Bank of Cleburne v. Gulf, C. & S. F. Ry. Co., 95 Texas 176, 66 S. W., 203; Cisco & N. E. Ry. Co. v. Diefenderfer, 23 S. W. (2d) 687.

*R. S. Shapard, S. W. Lancaster,* and *M. E. Clinton,* both of Dallas, and *Wagstaff, Harwell, Douthit & Alvis,* of Abilene, for defendant in error.

The contract between the railway company and the contractor to the effect that the railroad company would withhold payments due the contractor, after completion of his work under the contract, until the contractor had furnished it with written evidence that all accounts for labor and material had been paid, the railroad company was not required to pay to the contractor any money until said conditions had been met, and the bank took its assignment from the contractor subject to such right, and the approval of such assignment by the railroad company did not estop it from asserting its contract right to withhold said sums. Bridgeport Machine Co. v. First Natl. Bank, 44 S. W. (2d) 414; Id., 67 S. W. (2d) 606; Jen-

nings v. Willer, 32 S. W. 24. Hess & Skinner v. Turner, 110 Texas 148, 216 S. W. 621.

*Guthrie & Guthrie,* of Dallas, for intervenors.

MR. JUSTICE CRITZ delivered the opinion of the Court.

R. H. Locke was desirous of entering into a construction contract with the Texas & Pacific Railway Company. Lacking funds with which to finance such contemplated contract, Locke applied to the Citizens National ·Bank in Abilene, Texas, for a line of credit. The Bank agreed to extend the credit, provided Locke would deliver to it as security an assignment of all funds accruing to him under the contract with the Railway. This was agreeable to Locke, and the matter was presented to the Railway. The two contracts were then prepared;—one the contract between the Railway and Locke, and the other the assignment contract from Locke to the Bank. The assignment to the Bank was delivered to it, and on the same day it was signed by Locke the Bank mailed it to the Railway at Dallas with a letter, in which the Bank informed the Railway that Locke was mailing to it the construction contract. The Bank's letter requested the Railway to hold the assignment "until you receive these contracts, and upon your approval mail one of the copies back to us, when we will proceed to make Mr. Locke's loan if, and when, he needs same." On August 31, 1936, the Railway returned the assignment contract to the Bank, duly approved by the Railway. It appears that the construction contract was duly signed and entered into between the Railway and Locke.

By the terms of the construction contract, Locke agreed to do certain grading and culvert work for the Railway. This contract then provided: "The Railway shall pay the Contractor in current funds for the performance of this contract the following rates and prices, grading quantities to be measured in excavation." Then follows a schedule showing the rates and prices that the Railway was to pay Locke for the things he was to do and perform under the contract.

We deem it important to here quote in full subdivisions 5 and 6 of the contract between Locke and the Railway. They are as follows:

"5. As soon as possible after the first day of each month, the Engineer shall estimate the quantities of work completed under this contract, and by applying unit prices shall determine the

total work performed and the amount due the Contractor. The Railway shall as soon thereafter as such estimate can be audited and passed for voucher in the course of the Railway's business, pay the Contractor the amount of such estimate less previous payments and less fifteen (15) per cent.

"6. Upon completion of the work herein provided, the Chief Engineer shall have an inspection made and if the work is complete and satisfactory, a final statement of all the work done and moneys due the Contractor shall be made by the Railway Engineer, whereupon, after the Contractor has furnished written evidence satisfactory to the Railway, that he has paid in full all amounts that may be due by him to any and all persons who may have performed labor or furnished materials or supplies to the Contractor in connection with the work to be done hereunder, the Railway shall pay to the Contractor the full amount earned under this contract, less payments previously made, as soon as final statement can be audited and passed for voucher in the course of the Railway's business."

The assignment contract from Locke to the Bank identifies the contract between the Railway and the Bank; it recites that Locke has arranged with the Bank for funds to carry out the contract with the Railway, and states that in order to protect the Bank he desires to assign and transfer to said Bank any and all sums of money that may become due under such contract by the Railway. The assignment contract then assigns all money to become due under such contract to the Bank, with full authority on the part of the Bank to collect and receive the same. As already stated, this contract was duly approved by the Railway.

In due time Locke complied with his contract with the Railway, and same was accepted by it. In the meantime Frank Parrott, Fort Worth Sand & Gravel Company, and F. C. Crane Company had furnished Locke with materials and machinery used in and on this project, for which Locke has never paid. It appears that the amounts respectively of such claims are: to Frank Parrott, $555.11; to Fort Worth Sand & Gravel Company, $175.32; and to F. C. Crane Company, $137.77. It also appears that on February 16, 1937, Locke owed the Bank $2,-173.30, which sum, with accrued interest, is the amount of Locke's indebtedness to the Bank. It conclusively appears that none of the parties above mentioned, who furnished Locke with material and machinery, have ever fixed, or attempted to fix, any lien against the Railway, and that when this suit was filed and tried in the district court, the time had long since

passed when, under applicable statutes, any lien could be fixed against the Railway for any matter arising out of this contract. It also appears that at the time this case was tried the Railway had in its hands, unpaid on the Locke contract, the sum of $2,259.11. This sum was the amount of the 15% retainage. If the Bank is entitled to collect this fund under its assignment, its claim, including interest, is greater than the fund.

After the completion and acceptance of Locke's contract with the Railway, the Bank made demand on it for the payment of the $2,259.11. The Railway refused payment, and this suit was filed by the Bank to collect the same. Frank Parrott, Fort Worth Sand & Gravel Company, and F. C. Crane Company intervened, respectively claiming the right to collect their claims against Locke out of the fund in the hands of the Railway.

On final trial in the district court judgment was entered for the Bank against the Railway. It was also adjudged that the three intervenors above named take nothing against either the Bank or the Railway. The judgment adjudged costs. The Railway and the intervenors appealed to the Court of Civil Appeals at Eastland. On final hearing in the last named court the judgment of the district court was reversed and the cause remanded to the district court for a new trial. 126 S. W. (2d) 765.

As we interpret the opinion of the Court of Civil Appeals, it holds:

(a) That that part of the contract between the Railway and Locke which provides for final payment to Locke "after the Contractor has furnished written evidence satisfactory to the Railway, that he has paid in full all amounts that may be due by him to any and all persons who may have performed labor or furnished materials or supplies to the Contractor in connection with the work to be done hereunder, * * *" made it unnecessary for such laborers and materialmen and supplymen to fix liens on the fund here involved, because the above-quoted contractual provision was made for their benefit.

(b) That even if such contractual provision were not made for the benefit of such laborers, materialmen and supplymen, nevertheless the Railway was under no duty to pay the Bank until Locke had complied with the letter of his contract with the Railway, and furnished it with written evidence that he had paid in full all amounts due by him to any and all persons who may have performed labor or furnished material or supplies on the project.

(c) That "Since the Railway Company has no property right in the fund but is entitled to withhold the payment thereof to the bank until compliance with the condition upon which such payment was promised; and since such condition cannot be met except by payment of the claims of intervenors, we are of the opinion that, in the right of the Railway Company, if not in their own right, the intervenors were properly permitted to come in and to have their several judgments against the Railway Company in pro tanto discharge and acquittance of the Railway Company's obligation to the bank."

Before proceeding further we deem it appropriate to state certain well-established rules of law, which we consider germane to the decision of this case:

■ (1) Rules of construction as applied to contracts are for the purpose of enabling the court to ascertain from the contract itself, that is the language used, the manner and extent to which the parties intended to be bound. Courts do not resort to arbitrary rules of construction where the intention of the parties is clearly expressed in unambiguous language. Magnolia Petroleum Co. v. Connellee (Com. App.), 11 S. W. (2d) 158.

(2) The cardinal rule of construction as applied to all contracts is to ascertain the intention of the parties as expressed in the language used in the instrument itself. In this connection, it is the intention and purpose of the contracting parties, as disclosed by the instrument, which should control. 10 Tex. Jur., p. 272, Sec. 159.

(3) A contract must be construed in accordance with its language. Its terms, when free from ambiguity and not in conflict with law, establish the rights of the parties. 10 Tex. Jur., p. 279, Sec. 163.

■ (4) It is the duty of the court, in determining the meaning and intent of a contract, to look to the entire instrument; that is, the contract must be examined from its four corners. Stated in another way, the contract must be considered and construed as an entire instrument, and all of its provisions must be considered and construed together. It is not usually proper to consider a single paragraph, clause, or provision by itself, to ascertain its meaning. To the contrary, each and every part of the contract must be construed and considered with every other part, so that the effect or meaning of one part on any other part may be determined. 10 Tex. Jur., p. 282, sec. 164.

■ (5) It is the law of this State that a person not a party

to a contract may enforce it if it appears that it was made for his benefit. 10 Tex. Jur., p. 478, sec. 278; 12 Am. Jur., p. 833, sec. 281; 17 C. J. S., p. 1121.

(6) Parties are presumed to contract for themselves. It follows that a contract will not be construed as having been made for the benefit of a third person unless it clearly appears that such was the intention of the contracting parties. 17 C. J. S., p. 1129.

■ We come now to construe this contract. In doing so we apply the rules of construction above announced. An examination of this contract discloses that it was duly entertained into between the Railway and Locke; that it bound Locke to do certain construction work for the Railway; and that the Railway bound itself to pay Locke for such work in accordance with a certain schedule of prices set out in the instrument. It is then provided that the Railway shall make monthly payments for completed work at the scheduled prices, except 15 per cent. should be retained in the hands of the Railway. It is then provided that on completion of the work and "after the contractor has furnished written evidence, * * * that he has paid in full all amounts that may be due by him to any and all persons who may have performed labor or furnished materials or supplies to the contractor in connection with the work done herein, the Railway shall pay to the contractor the full amount earned under this contract, less payments previously made." We here pause to note that there is no contention that there are any unpaid labor claims. To our minds, when this contract is viewed as a whole and in the light of the above-stated rules, and when the provision providing for final payment "after the contractor has furnished written evidence that he has paid in full" certain named classes of persons, is read in the light of the entire contract, and in the light of our applicable lien statutes, it becomes plain that the provision of paragraph 6 of the contract, just referred to, was not intended as an absolute condition to be enforced regardless of any necessity or reason therefor; or as a contractual provision made for the benefit of third persons. To the contrary, it is evident that the provision was embraced in the contract only to protect the Railway against those who might claim liens against it under our lien statutes pertaining to railroads. Simply stated, we think that the contract, considered as a whole, shows that the provision of paragraph 6 under discussion was inserted therein for the benefit of the Railway alone. We further think that, since the Railway has received and accepted the benefits of this contract in full, and

since the enforcement of the requirement of paragraph 6, regarding the furnishing of written evidence of the payment of certain claims, will be of no benefit to the Railway, for whose benefit alone it was written into the contract, there is no reason in law or in equity why it should not now discharge its obligation to pay for the services performed by Locke for it. 40 C. J., p. 365; Getty et al. v. Penn. Inst., etc., 194 Pa. 571, 45 Atl. 333. We think it would be giving this contract an unreasonable construction to say that the provision of paragraph 6 under discussion imposes a condition in favor of the Railway, absolute in its terms and effect, even though the Railway has no further interest in its enforcement and could not benefit thereby; and even though the Railway has received and accepted the full benefits of the contract. "A contract will not be presumed to have imposed an absurd or impossible condition on one of the parties, but will be interpreted as the parties must be supposed to have understood the condition at the time." 12 Am. Jur., p. 848, sec. 295.

In 40 C. J., 365, supra, the rule is thus announced:

"Likewise contract provisions for the retention by, or on behalf of, the owner, of the contract price, or a part thereof, until claims for work and materials have been paid or liens therefor have been discharged, are construed to be for the benefit of the owner, rather than of laborers, materialmen, or subcontractors, and not to confer on the latter any rights in the fund retained."

In Getty et al v. Penn. Inst., etc., supra, the Supreme Court of Pennsylvania had before it a construction contract, wherein the owner entered into a contract with a contractor for the construction of a building for the owner. The contract provided for a total consideration of $286,300.00, payments to be made monthly, but the amount to be paid not to exceed 80% of the certificates of the architect; final installment not to be payable until all mechanics and materialmen *"shall have in writing acknowledged that they have been fully paid by the contractors for their work and materials done and furnished."* The building was completed and accepted by the owner, and there remained in its hands the final settlement, amounting to $57,260.00.

Under the above contract certain subcontractors asserted claims against the retained fund. The court held that the clause in the contract above quoted was inserted in the contract for the sole benefit of the owner and not for the benefit of third parties. We quote as follows from the opinion:

"If the contract had provided that, on the failure of the principal contractors to deliver the written acknowledgments specified, the money should be withheld from them, for the benefit of all the subcontractors who had not been paid, it might have been forcibly argued that such provision constituted an equitable assignment of the fund for their benefit. But that is not the contract. It provides that the money shall not be paid to the principal contractors until the written acknowledgments are obtained. Obviously, this is for additional protection to the owner. True, it has secured an express waiver of the right to file liens; but is may choose to take no chance of harassing litigation by wronged subcontractors and material men, and may insert as many provisions, not for the benefit of subcontractors, but for its own protection, as it chooses."

As against the contention that the above-quoted provision was a condition that the owner could enforce, regardless of any benefit to it in doing so, the opinion says:

"But it is asked, can defendant honestly retain this money, and pay to nobody? We answer, no. Whenever the written acknowledgments are obtained, either by the principal contractors or their assignee, or when, under the limitations of the mechanic's lien law, defendant is beyond peril as to liens against its buildings and grounds, it owes a debt, in such amount as is yet unpaid of the contract price, personally to the principal contractors, which it is bound to pay to the assignee to whom the assets have passed."

The judgment of the Court of Civil Appeals is reversed, and the judgment of the district court affirmed.

Opinion delivered March 19, 1941.

Rehearing overruled May 14, 1941.

MR. JUSTICE SHARP, dissenting.

I do not agree with the opinion of the majority. As I view the case, the questions presented are simple and are governed by elementary and well-established principles. Briefly stated, the case is this:

Locke contracted with the railway company to construct certain improvements on its property and to furnish all labor and material required for the work. By the terms of the contract the railway company was to pay for the work as it progressed, in monthly installments, based on the amount earned

less fifteen per cent. retained. When the work was completed and accepted the retained fund amounted to $2259.11. By an instrument of even date with the contract, which was prepared and approved by the railway company, Locke assigned to the bank as security all funds to become due him under the contract. The instant suit was filed by the bank as assignee of Locke to recover the amount of the retained fund above named. The intervenors furnished Locke materials and machinery used in the work, but fixed no liens to secure their claims. The contract between Locke and the railway company with respect to the retained fund provided in paragraph 6 thereof as follows:

"* * * after the Contractor has furnished written evidence satisfactory to the Railway, that he has paid in full all amounts that may be due by him to any and all persons who may have performed labor or furnished materials or supplies to the Contractor in connection with the work to be done hereunder, the Railway shall pay to the Contractor the full amount earned under this contract, less payments previously made, * * *."

Before expressing my views on the main question presented, it is deemed proper to observe here that, as assignee of such funds, the bank acquired no better right than Locke himself possessed. 5 Tex. Jur., p. 43, and authorities there cited. The case, therefore, must be determined just as if Locke himself were the plaintiff. The majority opinion states, "We here pause to note that there are no claims for labor here involved." I do not understand the meaning of the sentence, for surely it could not be held that laborers would occupy a different status from the intervenors, in view of the language of paragraph 6 above quoted, which certainly places them in the same classification.

The majority opinion announces six rules of law with which I am in complete harmony. That my view of the applicable principles of law may be made clear, I quote from the authority cited by the majority in support of the first rule, Magnolia Petroleum Co. v. Connellee, 11 S. W. (2d) 158, as follows:

"* * * There are some rules applicable for the construction of written contracts, for the purpose of ascertaining from the language used the manner and extent to which the parties intended to be bound. Courts, however, are not permitted to resort to arbitrary rules of construction where the intention of the parties is expressed in clear and unambiguous language (Pierce-Fordyce Oil Ass'n. v. Warner Drilling Co. (Tex. Civ. App.) 187 S. W. 516), but will enforce the contract according to its terms (Benskin v. Barksdale (Tex. Com. App.) 246 S. W.

360; Perry & Co. v. Langbehn, 113 Tex. 72, 252 S. W. 472; Rankin v. Rhea (Tex. Civ. App.) 164 S. W. 1095). As is well said by Chief Justice Cureton in Texas Farm Bureau Cotton Ass'n. v. Stovall, 113 Tex. 273, 253 S. W. 1101:

" 'The primary test of the character of a contract is the parties' intention as manifested by its terms.' "

Rule 2 of the majority opinion cites in support thereof 10 Tex. Jur. p. 272, sec. 159, the first paragraph of which reads as follows:

"The cardinal rule in construing a contract is to ascertain and give effect to the intention of the parties, as expressed in the language which they have used, provided that such intention is not in conflict with the rules of law, and this is the general purpose of all rules for the construction of contracts."

Rule 3 cites 10 Tex. Jur., p. 279, sec. 163. That entire section expresses so clearly my views of the controlling principle of law applicable that I quote it in full as follows:

"A contract is to be construed in accordance with its plain language. Its terms, when free from ambiguity and not in conflict with the policy of the law, establish the rights of the parties.
"The law leaves the contract just where the parties themselves have put it, and the courts will enforce it as made, without regard to questions as to whether the parties contracted wisely or foolishly, or as to whether, in the light of subsequent events, a hardship may be worked.
"Accordingly the courts have often said that they cannot make a new contract for the parties, nor add to, modify, vary or change in any particular the contract as made, nor restore a contract which has become valuless through the operation of its terms."

My difference with the majority appears not to be on the controlling principles of law, but upon their application. To my mind, the majority opinion announces sound rules of law and then departs altogether from them. Our point of departure is reached when we begin to apply the rules. If there is any ambiguity whatever in the language employed by the parties, I have been unable to detect it; and the majority opinion does not point out wherein it lies. Could language be plainer, simpler, and more easy of understanding than the language of paragraph 6 above quoted? The majority opinion, to my mind, assumes the issues which we must decide. The key sentence in that opinion

is: "Simply stated, we think that the contract, considered as a whole, shows that the provision of paragraph 6 under discussion was inserted therein for the benefit of the railway alone." Just why a court would be warranted in saying that that provision was for one party alone, I am unable to understand. To my mind, it certainly was also for the benefit of the contractor. By its terms, had he met the condition prescribed within one day after completing the work, he would have been entitled to receive the retained fund immediately. Under the construction given by the majority, it would certainly have been a benefit to the contractor to have received the balance of his pay before the expiration of ninety days.

But, conceding for the purpose of this opinion that the contract was made for the benefit of the railway company alone, I ask what benefit? The majority opinion assumes the answer to that question in this language: "* * * it is evident that the provision was embraced in the contract only to protect the Railway against those who might claim liens against it under our lien statutes pertaining to railroads." What right have we to make that assumption? The majority opinion does not point out the applicable lien statutes. Presumably the reference was intended to be to Article 5452 et seq., R. C. S. 1925. To my mind one insuperable barrier to the conclusion of the majority is the very material difference between the language of Article 5452 and that employed in paragraph 6 above quoted. The parties to this contract provided for retaining a part of the amount to be paid until evidence was furnished that payment had been made "to any and all persons who may have performed labor or furnished materials or supplies to the contractor in connection with the work." The statute clearly gives no lien for supplies, and to assume that the parties intended to protect from a lien when no lien was possible would hardly be warranted.

But, be that as it may, and disregarding this apparent barrier, while still assuming that the provision was made for the benefit of the railway company alone, we return to the question, what benefit? Has a court the right to tell parties, contrary to their own construction of their own unambiguous language, that they meant certain unexpressed benefits and no others? There are many ways in which the railway company might have been benefited financially by having this retained fund applied to persons who had performed labor and furnished material and supplies used in connection with this work. Suppose the owner, instead of being a railway company, were an individual, and that the contract related to the erection of some business house in which it was contemplated that the

public would go to transact business. It is easy to perceive that such owner might be greatly benefited from a commercial standpoint by the enforcement of such provision. Good will is an asset the same as physical property. Persons and firms who might otherwise become customers might well fail to do so on account of the unpleasant memories that their labor or material which entered into the building had not been paid for. Such owner might be of the opinion that he might experience some difficulty in appeasing his prospective customers by answering to them that they had waited too long to file liens, and for that reason might desire to insert the provisions of paragraph 6 in his contract. To my mind, it is a natural and altogether commendable desire on the part of an individual to make provision that persons who furnish labor and material to erect an improvement for him should be paid therefor; and this quite irrespective of any financial gain that might flow therefrom.

For equal reasons, a railway company would be benefited by the enforcement of the provision in question in ways other than the possible avoidance of liens. The good will of the public means much to a railway company. It is a distinct asset of its business. A railway company might well conclude that its competitors would profit by its failure to protect laborers and materialmen. Besides, if such company desires to do that, why should courts prevent it?

No legislative authorization to insert paragraph 6 in the contract is required, but it is interesting to note that the Legislature recognized that parties might desire to afford greater protection to laborers and materialmen than that afforded by Article 5468, and accordingly provided in said Article that: "* * * Nothing in this law shall in any manner affect the contract between the owner and original contractor as to the amount, manner or time of payment of said contract price." But after all, we get back to the simple, fundamental principle with which we started. It is not for the courts to make contracts between parties, and tell them what they meant by the use of clear unambiguous language. Regardless of why the parties put this provision in the contract, the fact remains that it is there and that it violates no law or public policy; and it is my view that our limited duty is to enforce it as it is written.

The rule in 40 C. J., p. 365, is cited in support of the majority opinion. It will be observed that the rule cited contains this provision: "* * * or liens therefor have been discharged." In my judgment, that changes the entire aspect of the matter, and evidences clearly an intention only to protect the owner

against liens. No comparable provision is found in the contract here under review. It will also be observed that a study of the cases cited in the footnotes, in support of the foregoing rule, discloses that this precise question has not been decided in many jurisdictions. I think the reasons advanced in support of the holding in the majority opinion are unsound, and same will annul contracts authorized by law and which should be upheld.

But what of the intervenors? The oft used expression that a contract is made, or is not made, for the benefit of third persons, does not have but one and only one meaning. As used in some instances it means that at the time the contract was made intervenors acquired the right to compel the railway company to withhold payment for their benefit. We question whether the contract in the instant case was made for the benefit of third persons within that sense; but we do not decide that question, because it is not necessary to do so. The railway company is not objecting to the presence of the intervenors in this case. The only person objecting is the assignee of Locke. The railway company's attitude is that it owes the money, but it stands upon its contractural rights not to pay it to Locke's assignee until the condition precedent is met. The majority recognize that a condition precedent was set up. They would deny Locke or his assignee the right to recover the retained amount for ninety days unless he or it complied with the provisions of paragraph 6. Such holding, to my mind, is that there was a condition precedent for ninety days. What I cannot agree to is that there is any language in the contract that would authorize any court to say that the parties intended for that condition precedent to become dead words at the end of ninety days. Under my view, to construe the provision as merely a protection from liens is to give it no meaning; for no court would compel an owner to pay a contractor and then pay off liens.

Since the bank is not entitled to this fund under the plain terms of the contract, and since the railway company neither has nor claims any property right thereto, a situation has arisen which inures to the benefit of the intervenors; that is, the exercise by the railway company of its rights has inured to intervenors' benefit. At the incipiency of this contract the railway company was given the right to retain this fund for the benefit of persons in the position of intervenors. It may not have assumed an obligation to do so, in the sense that it would be liable to such persons had it failed to retain it, but it reserved the right to do so. Therefore, in that sense the contract was made for the benefit of intervenors and others similarly situ-

ated. To give it a lesser meaning would be to give to paragraph 6 no meaning at all.

It is unquestioned that the parties had the right to make the foregoing contract. This being so, they had the right to require its fulfillment. It is not the policy of the law to bestow a right without furnishing a remedy for its enforcement. The railway company and the contractor, in plain and specific language, agreed that "after the contractor has furnished written evidence satisfactory to the Railway, that he has paid in full all amounts that may be due by him to any and all persons who may have performed labor or furnished materials or supplies to the Contractor in connection with the work to be done hereunder," in that event the railway company shall pay to the contractor the full amount earned under this contract, etc. It is also unquestioned that this plain agreement was not complied with by the contractor or his assignee. The railway company admits that it holds the money, and it is willing to pay same when the contract has been complied with. The dispute as to who is entitled to the money involved in said contract is now pending in the courts for settlement. All parties claiming an interest in such fund are before the court. Courts are established to give to the parties all the relief to which they may be entitled, either in law or in equity. Certainly the railway company has the right to exact that the contract be complied with before it is compelled to pay the money. If the contractor or his assignee refuses or fails to comply with the plain terms of the contract, certainly the railway company should be permitted to have its rights, as well as the rights of all parties interested therein, settled in the courts, and in such settlement obtain the relief provided by such contract, even if the money retained is applied to obtain such relief.

Courts are not powerless to do justice in a situation like that here presented. To my mind, there can be but one disposition of this cause which will be in consonance with sound legal principles, and that is to apply this retained fund first to the payment of the claims of intervenors, and then, if any remains, to the claim of the bank.

I do not mean to imply that, had the claims exceeded the retained fund, and had some of them been secured by liens and others not so secured, the lien creditors would not have been given priority. In such situation I think the law which gives priority to lien creditors would be read into the contract.

It is my view that the judgment of the Court of Civil Ap-

peals should be affirmed, and, so believing, I respectfully enter my dissent.

Opinion delivered March 19, 1941.