**CASTLE v. LLOYDS CAS. INSURER, et al.**

No. 12326.

Court of Civil Appeals of Texas. Galveston.

Nov. 8, 1951.

Rehearing Denied Dec. 6, 1951.

Bracewell & Tunks and Bert H. Tunks, all of Houston, for appellant.

Kemper & Wilson and W. L. Kemper, all of Houston, for appellee.

GRAVES, Justice.

This was a suit by an employee (a licensed attorney, as well as an experienced insurance executive) against his employers, some four insurance companies, upon a contract of employment of the former by the latter.

In a trial before a jury, after both sides had rested, the court, upon the defendants' motion, withdrew the cause from the jury, and rendered judgment for the plaintiff there for $23,471.55 against defendants there, whereas he sought to recover of them the much larger sum of some $91,-544.08.

The plaintiff below, Mr. Castle, has become the appellant here, whereas the defendants there, i. e., Lloyds Casualty Insurer, a Lloyds company, General Mutual Insurance Company, a mutual casualty company, Metropolitan Credit Insurance Company, a limited stock life insurance company, and Pan American Casualty Company, a stock company, have become the appellees, all four of which appellees appeared to have been owned and operated by the members of the Gammage family, i. e., Messrs. T. E. Gammage, Sr., Earl Gammage, and Earnest Gammage.

The contract so declared upon by the appellant was in writing, a full copy of the body of which has been attached hereto as Exhibit "A".

Appellant states a total of fourteen Points of Error.

The trial court simply adopted the recitations of the appellees' motion to dismiss the jury, and, without hearing any evidence in support thereof, arrived at the $23,-471.55-amount of its judgment in favor of the appellant by adopting the $20,568.96-amount, stated by appellees as being what they owed appellant, in their letter of De-

cember 28, 1948, electing to terminate their contract with him, in which they tendered him their check for such amount, as being all they owed him, detailing it as follows:

"Endorsement of the accompanying check is acknowledgement of full settlement of your account as listed below: Termination of profit sharing contract dated December 31, 1945, per paragraph six thereof:

"Amount paid on 1947 profits $14,411.26
"Salary from December 27,
1948, to December 27, 1949.     6,000.00
"Salary from December 16,
1948, to December 27, 1948,
inclusive ................     157.70
                              _____
                            $20,568.96"

The court merely added interest upon such sum to the date of its judgment, increasing it to the $23,471.55-amount.

As recited, there was no evidence in behalf of the appellees submitted in support of the motion to dismiss the jury, on which the court so rendered its judgment; indeed, at the trial, the appellant was the only witness to testify, whereupon the appellees declined to present any evidence and rested their cause, subject alone to the court's action upon their motion for an instructed verdict, and judgment in their favor. The principal contention of appellees, as set forth in their motion for instructed verdict, was that the appellees had, under the terms of paragraph six of the contract, tendered to appellant all of the money he was entitled to receive from them, and that appellant was not entitled to receive any of the 1948 profits of appellees.

It will be deemed unnecessary to pass upon all the recited fourteen Points of Error, since, in the view this court takes of the cause, appellants' first assignment, challenging the trial court's having so granted the appellees' motion to withdraw the case from the jury and upon such motion alone to render judgment, was controlling of the whole controversy.

That action is held to have been reversible error; i. e., it is held that the terms of the contract itself so declared upon, together with the vast amount of

testimony in support and as interpretative thereof, oral and written, that the appellant tendered, raised questions-of-fact for the jury; wherefore, the trial court could not, upon the mere basis of the appellees' unsupported motion, conclude that the appellant had no case under the terms of such contract he so based his suit upon. The contract was drawn by the attorney-in-fact for one of the defendant insurance companies, hence it was construable, insofar as the rule of law goes on that subject, as favorable to the appellant, rather than to the appellees. Authorities: Holt v. Wilson, Tex.Civ.App., 55 S.W.2d 580, Hinson v. Noble, Tex.Civ.App., 122 S.W.2d 1082.

█ Moreover, with all due deference to both sides in this controversy, this court is unable to say that the terms of this contract are so clear and free from any ambiguity as to have left the determination of the rights and duties of the parties under it as a matter of law for the trial court, enabling it to give effect to the intention of the parties thereto as expressed in the words used, such as the Supreme Court passed upon in Citizens Nat. Bank in Abilene v. Texas & P. Ry Co., 136 Tex. 333, 150 S.W.2d 1003.

Rather, it is held that this contract was not so clear from an examination of the instrument itself; hence it was the duty of the court below to have sought the intention of the parties by looking to the surrounding circumstances, their situation when the written instrument was entered into, the subject-matter of the writing, together with the acts of the parties themselves in getting at just what construction should be given it. Ryan v. Kent, Tex.Com. App., 36 S.W.2d 1007, Redwine v. Hudman, 104 Tex. 21, 133 S.W. 426, American Nat. Ins. Co. v. Teague, Tex.Com.App., 237 S.W. 248, Tex.Com.App., 239 S.W. 604.

In sum, it is held that this record establishes—as a matter-of-law from its construction—that appellant was entitled, under the terms of his contract, to participate in the profits earned by his employers during the calender year of 1948; and that, in computing those profits questions-of-fact were raised over the following factors thereof: What were their profits as represented by these details: (1) excessive claims-reserves; (2) equities in unearned premium-reserves; (3) the profit of Lloyds Casualty Insurer, by way of dividend, if any, on the stock of Metropolitan Credit Insurance Company; and (4) the 1948 profit, if any, of Metropolitan Credit Insurance Company?

These conclusions require a reversal of the appealed-from judgment, and a remanding of the cause to the trial court for another trial.

### Exhibit "A"

"The State of Texas ⎱
"County of Harris ⎰

"Know All Men By These Presents:

"That Lloyd's Casualty Insurer, of Houston, Texas, acting herein by and through Earl W. Gammage, attorney-in-fact for the Underwriters thereat, hereinafter called Lloyd's, Warren P. Castle, of Houston, Texas, hereinafter called Castle, and General Mutual Insurance Company, of Houston, Texas, acting herein by and through its president, T. E. Gammage, Sr., hereinafter called General Mutual, have this date entered into the following contract and agreement of employment, to-wit:

"Witnesseth

"1.

"Lloyd's does hereby hire and employ Castle as executive special agent of Lloyd's for an indefinite period of time in the future unless and until this contract of employment is changed or terminated by mutual written consent or terminated by Castle or by Lloyd's in the manner hereinafter provided. As executive special agent of Lloyd's, Castle's duties shall be to assist the attorney-in-fact and associate attorneys-in-fact in the management and conduct of the affairs of Lloyd's and its insurance operations, and to that end Castle agrees to devote his entire time, labor and attention, in good faith, to the conduct and profit of the insurance business of Lloyd's and towards the up-building and success of said business; assisting the attorney-in-fact and associate attorney-in-fact not only in the operations of the general affairs of

Lloyd's and its Underwriters thereat, but also in the acquisition of agents, agency supervision, and supervision of claims, legal matters and the underwriting and accounting departments of Lloyd's. Castle agrees to continue his present law license as a practicing attorney in the State of Texas and, if required to do so by Lloyd's or its attorney-in-fact or associate attorneys-in-facts, shall investigate, prosecute and defend any and all claims, demands, suits, or causes of action of any nature asserted against or by Lloyd's without additional compensation therefor; and also to follow and perform the advice, directions and orders of Lloyd's or its attorney-in-fact or associate attorneys-in-fact and to do any and all other acts and things connected with the business of Lloyd's, as said Lloyd's, its attorney-in-fact, or its associate attorneys-in-fact shall from time to time direct and/or that be of a kind properly belonging to the duties of an executive special agent of an insurance company. Castle shall not be employed or engaged in any capacity in undertaking or carrying on any other business and shall not be interested or concerned directly or indirectly in any business or firm or corporation undertaking or carrying on any business of a similar nature to or which may compete with that of Lloyd's.

"2.

"Castle shall not, either during the term of his employment or at any time thereafter, use or disclose to any person, firm, or corporation any information concerning the business of affairs of Lloyd's its customers, clients, agents or assureds which he may have acquired in the course of or as incident to his employment hereunder, for his own benefit or to the detriment or probable detriment of Lloyd's and shall not at any time do anything which may cause or tend or be likely to cause any loss or damage to Lloyd's in business, reputation or otherwise. Further, Castle shall not divulge any matters relating to Lloyd's business or to any customers, clients, agents or assureds of Lloyd's which may become known to him by virtue of this contract of employment or otherwise, save insofar as may be necessary in the interest of Lloyd's business

and the performance of his duties as executive special agent for Lloyd's. Castle shall not draw, accept or make any bill of exchange or promissory note on behalf of Lloyd's or otherwise pledge Lloyd's credit except so far as he may have been theretofore duly authorized in writing by Lloyd's and all monies received by Castle for and on behalf of Lloyd's shall be promptly accounted for and delivered to Lloyd's and its banking facilities.

"3.

"Lloyd's agrees to pay Castle a salary of Five Hundred ($500.00) Dollars per month (less any amounts required to be deducted or withheld pursuant to any State or Federal law), Two Hundred Fifty ($250.00) Dollars being payable on the 15th day of the month and the remaining Two Hundred Fifty ($250.00) Dollars being payable on the last day of the month, and also to pay Castle, as salary, a sum equal to 12½% of the annual net profits of the business of Lloyd's, said amount to be calculated from January 1st to December 31st of each year and to be paid within thirty days after the end of the year but in no event later than March 1st of the year following. Said profits are to be ascertained and certified by the chief accountant employed by Lloyd's, whose certificate as to the amount of such annual net profits shall be conclusive.

"Said salary and percentage of profits of Lloyd's shall begin on January 1, 1946, and continue as herein provided.

"4.

"If there results a slump in business, commonly known as a national depression, whereby a Five Hundred ($500.00) Dollar monthly salary is excessive, and not fair and reasonable under the then circumstances and/or Lloyd's estimated annual net profit, based on the then monthly net profit, is Ten Thousand ($10,000.00) Dollars, or less, then Castle agrees that his monthly salary shall be reduced to a more reasonable amount per month, but in no event less than Two Hundred and Fifty ($250.00) Dollars per month, instead of Five Hundred ($500.-00) Dollars per month, said more reason-

able amount to be determined by the then management of Lloyd's; however, Castle's additional salary based on the 12½% of the annual net profits of Lloyd's shall remain the same. In such event, the other provisions of this contract shall accordingly be amended to refer to said reduced amount of salary per month of Castle.

"Lloyd's, its attorney-in-fact, and associated attorneys-in-fact agree that in computing the annual net profits of Lloyd's for the purpose of paying Castle his 12½% thereof, no annual salary or attorney-in-fact fee in excess of $6500.00 per year shall be charged as an expense; provided, however, Castle's salary and percentage of the profits shall be charged as an expense, and provided further, nothing herein shall prevent the payment of an annual salary or attorney-in-fact fee in excess of $6500.-00 per year if such excess is not taken into account as an expense in paying Castle his 12½% of the annual net profits; and, provided further, that for good and sufficient reasons, making it fair, equitable, and reasonable, under the circumstances, any sum as salary or attorney-in-fact fee may be paid and charged as an expense, if Castle consents thereto in writing, and Castle, in such instance, agrees to give his written consent thereto when such sums are paid for bona fide services rendered to Lloyd's and Lloyd's has received value therefor. Nothing in this paragraph shall apply to any commission or other compensation paid any general, special, or local agent or to any commission or other compensation paid to any special underwriter and/or attorney-in-fact (or to any person by any other name or designation) who produces, acquires, or arranges for any insurance business for Lloyd's, including any sums paid to any person for any type of finance company or customer insurance risk.

"5.

"With respect to the payment to Castle by Lloyd's of 12½% of the annual net profits made by Lloyd's, it is agreed that there is at this date approximately One Hundred Twenty Eight Thousand ($128,-000.00) Dollars in present potential profits to Lloyd's that have been used by Lloyd's

to put up reserves equal to 50% of the total premiums (as required by the Texas Insurance Department) on all special Underwriter and/or attorney-in-fact finance policies (meaning Automobile, Health & Accident, and Transaction Guaranty Bond insurance policies written for customers of different finance companies) by Lloyd's wherein the remuneration to Lloyd's is less than 50% of the premium and that as to such profits Castle shall not share therein in the event same or any amount thereof is established in the future by a reduction of such special Underwriter and/or attorney-in-fact finance policies on the books of Lloyd's or otherwise. It is further understood and agreed that the reserves set up by Lloyd's for unsettled claims is only an estimate of the liability of Lloyd's under said claims and, therefore, the actual profits of Lloyd's may or may not be as shown by the books of Lloyd's depending on the accuracy of the reserves so set up. Therefore, it is stipulated that the 12½% of the annual net profits of Lloyd's that will be paid to Castle each year is only a tentative payment of his said portion of the net profit and that each subsequent year a final adjustment, up or down, shall be made by and between Castle and Lloyd's of Lloyd's preceding annual net profit to reflect the actual net profit as well as Castle's 12½% of Lloyd's annual net profit, based upon the then obtained experience as to the actual value and/or costs of said claims for which reserves were set up. Said final adjustment shall be ascertained and certified by the Chief Accountant employed by Lloyd's whose certificate as to the amount of such adjusted annual net profits shall be conclusive. This adjustment of reserves for claims shall be only by and between Castle and Lloyd's for the purpose of paying Castle his portion of the net profits and shall not otherwise affect the operation of Lloyd's or its books and accounts. Lloyd's has also an unknown amount of present potential profits that is undisclosed because of contributions to surplus of Lloyd's by some of the Underwriters thereat and because of high reserves on present claims asserted against Lloyd's, including Schedule 'P' reserves on Automobile policies required

to be set up by the Texas Insurance Department. It is expressly understood and agreed that if, as and when such present potential profits or present potential profits from any other source are definitely established in the future Castle shall have no interest whatsoever therein, and in calculating his portion of the future annual net profits of Lloyd's such profits shall not be taken into account. It is expressly stated as the intention of the parties hereto that any and all character of present earned or potential profit of Lloyd's that is ascertainable now or that Lloyd's has made up to and through December 31, 1945, shall be and remain the profit of Lloyd's and Castle shall have no interest therein and shall receive no part of same in calculating his 12½% portion of the future annual net profits of Lloyd's. The foregoing provisions with respect to present earned or potential profits of Lloyd's shall likewise apply to General Mutual and Castle shall not participate in any such profits of General Mutual.

## "6.

"Lloyd's may at any time it desires to do so, and for any reason whatsoever, terminate this agreement by giving Castle twelve months previous notice, in writing, at the end of which twelve months period this contract shall be fully and finally terminated and all parties relieved and released of any further liability hereunder, except that at the end of said twelve months period Castle shall thereupon receive and have fully paid to him 25% of the annual net profits of Lloyd's for that year instead of his customary 12½% thereof, and thereupon all parties shall be relieved and released of any further liability or obligation in the premises. In lieu of the twelve months notice hereinbefore provided for Lloyd's may pay Castle twelve times his monthly salary and thereupon Castle's services for Lloyd's shall be immediately terminated and Lloyd's released of any further liability or obligation in the premises, except that Lloyd's shall also pay Castle immediately an amount equal to the amount last paid Castle as his 12½% of the annual net profits of Lloyd's and in such event all parties shall thereupon be fully and finally released of any and all further liability or obligation hereunder.

## "7.

"Lloyd's may for 'cause' immediately terminate this contract of employment by giving Castle written notice of such termination and thereupon this contract shall be immediately fully and finally cancelled and terminated and all parties relieved and released of any further liability hereunder; and further thereupon the twelve months notice of termination or the payment of the sum of twelve times Castle's monthly salary as provided in the next preceding paragraph shall not be required, and neither shall Castle in such event be entitled to any portion of the annual net profits of Lloyd's. The word 'cause' as used in the preceding sentence shall mean and shall be construed to mean a breach, violation, or failure, or refusal of performance for any reason (illness included) by Castle of any of the terms and conditions of this contract of employment, or any of the duties and obligations required to be performed by Castle hereunder.

## "8.

"Castle may at any time he desires to do so, and for any reason whatsoever, terminate this agreement by giving Lloyd's three months previous notice in writing, at the end of which three months period this contract shall be fully and finally terminated and all parties relieved and released of any further liability hereunder, except that at the end of said three months period Castle shall thereupon receive and have fully paid to him his 12½% of the annual net profits of Lloyd's that has accrued up to that date for the current year, in which event, however, Castle shall be prohibited from engaging in the insurance business for a period of five years, as provided in the following paragraph of this contract.

## "9.

"Upon the termination of this agreement for any reason whatsoever, except by Lloyd's without 'cause', Castle agrees that he will not go into or engage in, directly or indirectly, any phase of the insurance business anywhere in the State of Texas in

competition with Lloyd's for a period of five years from the date of such termination, and during such period Castle expressly agrees not to solicit, directly or indirectly, the agents, accounts, customers, or assureds, then doing an insurance business with Lloyd's, it being stipulated that such agents, accounts, customers, or assureds belong solely to Lloyd's and that Castle has no interest whatsoever therein.

"10.

"Although this contract is made primarily by and between Lloyd's and Castle, it is understood and agreed that insofar as the Five Hundred ($500.00) Dollar monthly salary, as herein provided for, is concerned (and the possible reduction thereof, as provided in a preceding paragraph herein) Castle shall render the same and identical services which he is required to render herein to Lloyd's to the associated company of Lloyd's, to-wit: General Mutual Insurance Company, of Houston, Texas, when called upon so to do by Lloyd's its attorney-in-fact, or its associate attorneys-in-fact, and that Castle shall receive no additional compensation whatsoever therefor; provided, however, that in calculating the 12½% of the annual net profits of Lloyd's, agreed to be paid herein to Castle as additional salary, there shall also and in like manner be paid to Castle 12½% of the annual net profits of said General Mutual, same to be paid upon the same terms and conditions as provided herein for such payment by Lloyd's. In the event Castle is elected a director and/or officer of General Mutual, his service in such capacity shall be nominal and without compensation therefor since all remuneration to him from Lloyd's or General Mutual is to be solely as provided in this contract of employment. It is also understood and agreed that all other terms and provisions of this contract shall inure to the benefit of General Mutual and are enforceable for, by, and in behalf of General Mutual and all rights, duties, and obligations hereunder on the part of Castle are made and entered into with Lloyd's and General Mutual jointly and severally.

"11.

"It is expressly understood and agreed that Lloyd's General Mutual, and Castle have executed to each other a mutual release for the purpose of fully and completely releasing the other of any and all debts, claims, demands or causes of action whatsoever one may have against the other up to, through and including, December 31, 1945, which said release provides and acknowledges, and it is hereby confirmed and stipulated, that Castle has no interest whatsoever in General Mutual or in the Guaranty Fund, surplus, or profits of Lloyd's and that Castle's entire rights and obligations are governed solely by this contract of employment.

"In Testimony Whereof, witness our hands, in triplicate originals, at Houston, Texas, on this the 31st day of December, A.D. 1945.

"General Mutual Insurance
   Company
"By
   /s/ T. E. Gammage
   T. E. Gammage Sr.
   President
"Attest:
   /s/ Warren P. Castle
   Secretary

"Lloyd's Casualty Insurer
"By
   /s/ Earl W. Gammage
   Earl W. Gammage
"Attorney-in-fact
   /s/ Warren P. Castle
   Warren P. Castle"