**ALLIED BANK OF TEXAS, et al, Appellants,**

v.

**PLAZA DeVILLE ASSOCIATES, Plaza Associates, Duelm & Swientek Dry Wall Company, Inc., Larry Little d/b/a Quality Glass, Foster Electric Company, Inc., Project Lighting Company, Inc., CSA International, Inc., Fisher Brothers Lumber Company/Fisher Brothers Building Center, Bexar Insulation, and Action Drapery, Appellees.**

No. 04–86–00170–CV.

Court of Appeals of Texas, San Antonio.

May 20, 1987.

Rehearing Denied July 17, 1987.

---

J. Clifford Gunter III, Michael Kuhn, Mark E. Lowes, Carrin F. Patman, Houston, for appellants.

Tom Allen Cunningham, Roger Townsend, Judith Meyer, Sarah Duncan, Fulbright & Jaworski, Houston, Jane H. Macon, James A. Kosub, San Antonio, for appellees.

Before CADENA, C.J., and BUTTS and REEVES, JJ.

## OPINION

BUTTS, Justice.

Allied Bank of Texas appeals from a judgment requiring it to pay damages to Plaza DeVille Associates for fraud and to Plaza Associates for fraud, breach of contract and negligence. The judgment also subordinated Allied's liens on certain property to those of various mechanics and materialmen under the theory of equitable subordination. Plaza Associates appeals from part of the judgment which awarded Allied damages for conversion.

This lawsuit arose as the result of Allied's administration of two construction loans providing Etto Corporation with funds to build an apartment complex in San Antonio. Allied loaned the money to Etto pursuant to two Construction Loan Agreements concerning development of Phase I and Phase II of the Plaza DeVille Apartments.

At the same time Allied and Etto executed their loan agreements, Etto sold its interest in the project to two investment limited partnerships created by the Balcor Company, a subsidiary of Shearson/American Express. Plaza DeVille Associates bought Phase I of the apartment development, and Plaza Associates bought Phase II. Etto agreed to complete the improvements through Purchase Agreements executed with each of the Plaza entities. Allied consented to this sale in Lender/Buyer Agreements between itself and the Plaza entities.

Etto completed construction of Phase I and obtained permanent financing for that project. However, Etto defaulted on its obligations regarding Phase II. Allied posted Phase II for foreclosure, while Etto filed for bankruptcy. Etto Corporation is not a party to the suit.

The day before the scheduled foreclosure, the Plaza entities sued to enjoin the foreclosure and alleged various causes of action against Allied stemming from its administration of the loans to Etto. The Plaza entities also sued the several holders of mechanics' and materialmens' liens alleging that the liens were fraudulent. The lienholders filed cross-actions against the Plaza entities and Allied, while Allied filed cross-actions against the Plaza entities.

After a jury trial the court entered judgment against Allied, awarding the Plaza Associates actual and exemplary damages based on their causes of action for fraud, breach of contract and negligence, as well as actual and exemplary damages to Plaza DeVille Associates on their fraud claim. The judgment further subordinated Allied's liens to those of the lien claimants on the theory of equitable subordination. It also provided that Allied recover various credits from each of the Plaza entities, and awarded Allied damages for conversion of rental proceeds against Plaza Associates.

Allied raises thirty-three points of error and six cross-points, and Plaza, as cross-appellant, raises six points of error. Although the statement of facts consists of twelve volumes, and there are many exhibits, the lawsuit turns on established rules of contract construction and cases interpreting payment retention clauses in construction contracts.

### Allied's Liability under the Construction Loan Agreements

The basic question is whether Allied could be liable to the Plaza entities or the holders of mechanics' and materialmens' liens for its handling of the loan proceeds pursuant to the Construction Loan Agreements between Allied and Etto.[1] We hold

---

1. The Plaza entities claim that they were parties to the Construction Loan Agreement because that contract was executed at the same time and dealt with the same transaction as the Purchase Agreement between Plaza and Etto, and their Lender/Buyer agreement with Allied. The Plaza entities cite the well settled rule that separate instruments executed at the same time, for the same purpose, and in the course of the same

transaction may be considered as one instrument, to be read and construed together in determining the intent of the parties. *See, e.g., Jim Walter Homes v. Schuenemann,* 668 S.W.2d 324, 327 (Tex.1984).

Many opinions refer to this rule as a mandatory rule of construction, requiring contemporaneously executed documents which relate to a

that the loan agreements themselves precluded any such liability.

Courts are in the business of construing agreements, not making them. The cornerstone of contract construction demands that courts look to the language of the instrument itself to determine the intent of the parties. *See, e.g., Citizens Nat. Bank v. Texas & P. Ry. Co.*, 136 Tex. 333, 150 S.W.2d 1003, 1006 (1941) *cert. denied* 314 U.S. 656, 62 S.Ct. 109, 86 L.Ed. 526 (1941). As the Texas Supreme Court has ruled, "courts should examine and consider the *entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983) (emphasis in original).

If this examination reveals that the instrument is reasonably susceptible to more than one meaning, the contract is ambiguous. *Skelly Oil Co. v. Archer*, 163 Tex. 336, 356 S.W.2d 774, 778 (1961). However, if we can glean a definite legal meaning from a written instrument, then it is not ambiguous, and that meaning will bind the parties as a matter of law. *See, e.g., R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex.1980).

Each Construction Loan Agreement primarily set forth the prerequisites Etto was required to meet to be entitled to proceeds of its loans from Allied.[2] Sections II through V of the agreements described the documentation, representations, warranties and covenants Etto was required to supply to Allied in order to trigger Allied's obligation to make loan advancements. Section VI, entitled "Loan Advances," described the method by which Allied would disburse the loan proceeds. The Plaza entities and the lienholders base all their claims on allegations that Allied breached the obligations set forth in this section.

Section VI specified the details of Allied's disbursement procedures in the event Etto met all of the requirements listed in the prior sections of the agreement. Section VI, paragraph (a), provided that Allied would disburse the initial purchase price of the complex when Etto complied with the requirements of Section II of the agreement. Paragraph (b) detailed the schedule whereby Allied would make subsequent advances under the note.

Significantly, this part allowed Allied to withhold ten percent of the amount of an advance requested by Etto. According to the contract, Allied would pay ninety percent of the value of work done the previous month, "based on the contract prices of labor and materials incorporated in the work and materials suitably stored at the site ... as estimated by and per certificates of Borrower [Etto or its assigns], Borrower's Architect, and Lender's [Allied's] Representative, attached to a Request for Advance, ..." Allied would then pay the balance of the amount requested, the remaining ten percent retainage, thirty days after it was satisfied the improvements had been fully completed and "evidence satisfactory to the Lender [was] furnished showing that all bills for labor performed and material supplied by all Contractors [had] been fully paid...." Paragraph (c) merely reasserted the Borrower's obligation to spend the money advanced on the apartment project itself and not some unrelated venture. Finally, paragraph (d) detailed the schedule for payment of interest on the note.

Following those four provisions, Section VI contained this clause:

Notwithstanding anything to the contrary herein contained and only upon the

---

single transaction to be considered one, indivisible contract. *See, e.g., Veal v. Thomason*, 138 Tex. 341, 159 S.W.2d 472, 475 (1942). However, applied correctly, it is "simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation." *Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62, 65 (1959).

We find no indication that the parties intended the three documents to form a single contract in which all of the clauses were interchangeable from one agreement to another. But even if we view them that way, nothing in them imposed a mandatory obligation upon Allied to insure the loan proceeds would adequately pay all of the construction expenses.

2. The two Agreements, one dated December 27, 1983, the other February 2, 1984, differed only in that one applied to Phase I and the other applied to Phase II.

request of Borrower, Lender shall have the right, but not the obligation, to make such adjustments in the cost allocations set forth in Paragraphs (a) through (d) of Section VI of this Agreement as Lender in its sole discretion shall deem appropriate and thereby make Advances under said paragraphs in amounts greater than or lesser than the amounts specified in said paragraphs.

This clause clearly limited Allied's obligations detailed in the earlier paragraphs. Therefore, Section VI, taken as a whole, imposed only one duty upon Allied: to lend Etto up to the amount of money described in the note, provided Etto satisfied the conditions set forth in the Construction Loan Agreement.

Echoing this interpretation, Section VIII, paragraph 4, of the Construction Loan Agreement further provided:

> 4. All conditions to the obligation of Lender to make Advances hereunder are imposed solely and exclusively *for the benefit of Lender and its assigns and no other person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make Advances in the absence of strict compliance with any or all thereof and any or all of such conditions may be freely waived in whole or in part by the Lender at any time if in its sole discretion it deems it advisable to do so.* (Emphasis added).

This language reinforced the clear dictates of Section VI of the agreement: Allied could disburse all of the loan proceeds without incurring any liability for failing to follow the loan disbursement procedures. *See, e.g., Corpus Christi Bank and Trust v. Smith,* 525 S.W.2d 501 (Tex.1975); *Citizens Nat. Bank v. Texas. P.Ry. Co.,* 136 Tex. 333, 150 S.W.2d 1003 (1941). Allied's only mandatory obligation was to loan the money agreed to if Etto and its assigns met all the requirements set out in the agreement.

Yet the Plaza entities and the lien claimants insist that because Allied disbursed all of the loan proceeds without retaining ten percent, and without requiring Etto to supply proof that all of the materials and labor were fully paid for, Allied should be liable to them for actual and exemplary damages. The Plaza entities seek to force Allied to assume liability for the unpaid debts to the suppliers of material and labor relating to the apartment complex. They argue that if Allied had withheld ten percent of the loan proceeds and otherwise exercised all of its rights regarding loan distribution, requiring Etto to supply documentation of all costs and deposit money sufficient to cover completion of the project if the loan proved insufficient, the lien claimants would have been paid out of the loan proceeds.

However, this argument overlooks Allied's specific reservation of the right to waive those requirements. Allied expressly reserved the right to distribute the loan proceeds in any manner it deemed fit. The requirement for documentation showing where the money went and the right to retain a percentage of the loan proceeds until Etto supplied that documentation were clearly rights which Allied could waive without incurring liability. Those provisions were solely for Allied's benefit. *See Corpus Christi Bank and Trust v. Smith,* 525 S.W.2d at 504. *Citizens Nat. Bank v. Texas & P. Ry. Co.,* 150 S.W.2d at 1007; *Tezel & Cotter v. Roark,* 301 S.W.2d 179 (Tex.Civ.App.—San Antonio 1957, writ ref'd); *Scarborough v. Victoria Bank & Trust Co.,* 250 S.W.2d 918 (Tex.Civ.App.—San Antonio 1952, writ ref'd).[3]

The Plaza entities, as assignees of Etto's rights under the Construction Loan Agreement, had no contractual right to demand that Allied exercise all of the discretionary provisions under the agreement, and, thus, cannot later claim damages for Allied's failure to exercise its own rights. Allied's clear disclaimers of liability contained in Section VI and in Section VIII of the Construction Loan Agreement preclude Allied's

---

3. While those cases deal with materialmens' and laborers' rights to retained funds in construction contracts, the principle is the same as to Plaza. Arguably, the materialmen and laborers are in a better position to claim those funds than Plaza.

assumption of liability to anyone involved in this case, be they parties or third party beneficiaries.

The only way Allied might assume liability to Plaza for failing to exercise its own rights regarding loan distribution would be if Plaza were a surety of Etto's obligation under the note. *See Aetna Casualty & Surety Co. v. Russell*, 24 S.W.2d 385, 387 (Tex.Comm'n App. 1930, holding approved). A surety is one who makes "a direct promise to perform the principal's obligation if he fails to perform it as he agreed to do." *Tolbert v. Standard Accident Ins. Co.*, 148 Tex. 235, 223 S.W.2d 617, 619 (1949). However, in this case the Plaza entities specifically disclaimed any liability for Etto's failure to meet its obligations to Allied. Paragraph seven of the Lender/Buyer agreement between Allied and Plaza entities provided:

7. Neither Buyer [Plaza DeVille Associates in the contract dated December 27, 1983, regarding Phase I, and Plaza Associates in the contract dated February 2, 1984, regarding Phase II] nor any of its general or limited partners shall have any personal liability for the payment of the principal of or interest on the Note or for any claim based on the Note, or the performance or observance of the covenants, representations, warranties or obligations contained in the Note or in any instruments securing the Note....

Thus the Plaza entities were not sureties of Etto's obligations to Allied, and consequently had no standing to complain of Allied's waiver of its rights in disbursing the loan proceeds. *Aetna Casualty & Surety Co. v. Russell*, 24 S.W.2d at 387. We therefore hold, based on the language of the contracts, that Allied owed no duty to the Plaza entities, either contractual or legal, to fully exercise its own rights regarding loan distribution as described in the Construction Loan Agreements.

Accordingly, Allied cannot be liable to the Plaza entities for fraud, because the Plaza entities had no right to rely on any representations Allied made regarding the manner in which it would disburse the loan proceeds. Neither can Allied be liable for breach of contract, for the contract itself clearly enabled Allied to waive all its rights in disbursing the loan to Etto. Further, since Allied owed no duty to the Plaza Associates regarding the distribution of the loan proceeds, Allied could not be liable to them for negligence regarding the distribution of the loan.

Accordingly, we reverse the judgment of the trial court and render a take nothing judgment against appellees Plaza DeVille Associates and Plaza Associates on their respective claims for fraud, breach of contract, and negligence.

### *Equitable Subordination*

The judgment also subordinated Allied's lien on the property to those of the lien claimant's [4] on the theory of equitable subordination. We are mindful of precedent for the doctrine of equitable subordination. *See In the Matter of Mobile Steel Co., Benjamin v. Diamond*, 563 F.2d 692, 699 (5th Cir.1977). However, we hold that the doctrine cannot apply to the facts in this case. Allied did nothing inequitable to warrant the subordination of its liens. Allied's obligation under the contracts was to provide construction funds up to the amount evidenced by Etto's note. Allied fulfilled that obligation by disbursing the loan proceeds. The judgment subordinating the liens of Allied Bank of Texas to those of the appellees, the lien claimants in this case, is therefore reversed and rendered.

### *Allied's "Credits"*

Plaza DeVille and Plaza Associates, as cross-appellants, each bring several points of error. Their first concerns "credits" awarded to Allied to offset the amount it was ordered to pay the Plaza entities in actual and exemplary damages. The judgment ordered Allied to pay Plaza DeVille Associates actual damages amounting to

---

4. The lien claimants in this case are: Duelm & Swientek Dry Wall Co., Inc., Larry Little d/b/a Quality Glass, Foster Electric Co., Project Lighting Co., Inc., CSA International, Inc., Fisher Bros. Lumber Co./Fisher Bros. Building Center, Bexar Insulation and Action Drapery.

$175,000.00 plus prejudgment interest, and one million dollars in exemplary damages. The judgment went on to entitle Allied to a $600,000.00 credit against these amounts. The judgment further ordered Allied to pay Plaza Associates $501,000.00 plus prejudgment interest, and one million dollars in exemplary damages. Allied received a $1,200,000.00 credit against those amounts.

These credits represent amounts the jury found the Plaza entities withheld from Etto pursuant to their Purchase Agreement. The Purchase Agreement gave the Plaza entities the right to withhold purchase money from Etto in the event they were not satisfied Etto was conforming to the construction or purchase contracts. Allied's theory for receiving these offsets was that the Plaza entities contributed to causing Etto's bankruptcy by withholding purchase money in breach of the Purchase Agreement. Therefore, if Allied was liable for damages caused by Etto's default and subsequent bankruptcy, then the Plaza entities should contribute to paying those damages based on their failure to apply purchase money to cure Etto's default.

Most importantly, these credits were not compensation for damages to Allied. Allied was not seeking to recover these sums for any injury to themselves. These credits simply mitigated Allied's liability to the Plaza entities. Without passing on the validity of such credits under other circumstances, we hold that since Allied is not liable to the Plaza entities, the credits cannot be applied in this case. Accordingly, we reverse that part of the judgment awarding Allied credits totalling $1,800,-000.00.

### Allied's Claim for Conversion

■ The judgment further awarded Allied $150,000.00 for damages caused by Plaza Associate's wrongful withholding of Phase II rental proceeds. Appellee's second, third and fourth cross-points of error relate to this award. The jury found that Plaza Associates had converted Phase II rental proceeds rightfully belonging to Allied, that Allied was injured by the conversion, and that Allied was entitled to $150,-

000.00 in actual damages from Plaza Associates.

Plaza Associates maintains that there was no evidence or insufficient evidence to sustain this jury finding. Plaza argues that while Etto did assign Allied its right to rental proceeds from Phase II as part of Etto's security for the construction loan, Etto was only entitled to *net* proceeds from the rent on Phase II after Etto defaulted on its loan from Allied. Plaza claims that Etto's assignment to Allied of its right to rental proceeds as described in Etto's Assignment of Leases, executed February 2, 1984, could give Allied no more right to rental proceeds than Etto possessed at the time of the assignment. Plaza points out that the Management and Cash Flow Guaranty Agreement, executed February 1, 1984, entitled Etto to the rental income from the property only to the extent that gross rental income was sufficient to pay the expenses and fees of the project, and to make loan payments associated with the project. Plaza Associates admits to having received all the rental proceeds from Phase II from the time of Etto's default. However, Plaza claims that there were no *net* proceeds remaining after paying expenses. Plaza therefore forwarded no rental proceeds to Allied.

Paragraph six of the Lender/Buyer Agreement between Plaza Associates and Allied provided:

6. Buyer [Plaza Associates] hereby agrees that its rights under or pursuant to the terms of the Purchase Documents [expressly including the Management and Cash Flow Guaranty Agreement] are and shall be subordinate, inferior and subject to all of the liens and security interests now or hereafter securing payment of the Note or Notes....

Etto's Lease Assignment, which expressly gave Allied the right to collect all rents, served as part of Etto's security for the construction loan. Further, the Lender/Buyer Agreement between Allied and Plaza Associates specifically notified Plaza of that security interest. The record contains evidence that the rental proceeds amounted to at least $150,000.00 following

Etto's default. Therefore, we affirm the part of the judgment awarding Allied Bank of Texas $150,000.00 as damages for conversion of the rental proceeds.

The judgment is reversed and rendered that Plaza DeVille Associates and Plaza Associates take nothing and that the lien-claimants take nothing. The judgment is affirmed as to the damages to Allied for conversion of the rental proceeds.