The MONARCH MARKING SYSTEM
COMPANY, Petitioner,

v.

REED'S PHOTO MART, INC., Respondent.

No. B–3250.

Supreme Court of Texas.

Oct. 4, 1972.

Rehearing Denied Nov. 15, 1972.

Colbert N. Coldwell, El Paso, for petitioner.

Texas S. Ward, El Paso, for respondent.

POPE, Justice.

The Monarch Marking System Company (Monarch) sued Reed's Photo Mart, Inc., (Reed's) to recover the price of four million adhesive pricing labels which Monarch furnished Reed's pursuant to a written purchase order. Reed's defenses were that it mistakenly ordered four million instead of four thousand labels and that Monarch did not substantially comply with the terms of the purchase order. The trial court rendered judgment on the jury verdict and awarded Monarch $2,680 as the reasonable value of the labels and $750 as reasonable attorney fees. The court of civil appeals reversed the judgment of the trial court and remanded the cause for a new trial. 475 S.W.2d 356. We reverse the judgment of the court of civil appeals and reinstate the trial court's judgment.

On the morning of February 22, 1968, Alan Tromer, vice-president of Reed's, began filling out a purchase order for five different kinds of labels which Reed's desired to buy from Monarch. In handwriting he filled in the blank spaces for four different types of labels and in the quantity column he noted opposite each of the four orders "2M." At that point he was interrupted by a customer and it was not until later in the afternoon that he finished filling in the order. He described the fifth label as "Label as Attached," attached the copy of the desired label, and in the quantity column wrote "4MM." It was this last item which forms the basis of this suit.

The purchase order required delivery "At Once" and that shipment be by "P.P." or parcel post. In the lower left-hand corner of the purchase order there was printed in red letters:

IMPORTANT

Above order number must appear on all correspondence, invoices, packages and shipping papers. Notify us immediately if you are unable to ship complete order by date specified. Your acceptance of this order is your warranty to us that you are complying with the U.S. Fair Labor Standards Act of 1938, as amended, and we reserve the right to refuse merchandise not in strict accordance with this order.

Monarch's representative for the El Paso area after January 1, 1968, was Richard Cornelius, who lived in Albuquerque, New Mexico. He received Reed's order by mail on February 26, 1968, examined it and finding no irregularity, filled out two company orders as he had been instructed to do by his company. The first four items, each for "2M," were carried in stock and could promptly be shipped so he placed them on one company order. Since the order for "4MM" other labels required special printing at Monarch's California plant, he handled it by a separate company order. He wrote out the company order as "4000M" in place of "4MM" as used in Reed's purchase order. His reason for doing this was that labels were priced at $.67 per unit of one thousand and he wanted to show the number of units to the billing department. He also changed the method of delivery from parcel post to "Best Way." In order to ship the four million labels, weighing 622 pounds, by parcel post the shipment would have to be split up into twenty pound allotments. Although shipping by parcel post was not impossible, Cornelius testified that it was more costly and "certainly impractical." After filling out the company order, Cornelius testified that he sent a short letter of thanks to Reed's to which he attached the yellow copy of the company order. Jerry Reed, the owner of Reed's, denied having ever received the letter. On April 10, 1968, the four million labels were delivered to Reed's via motor freight. Alan Tromer refused the shipment and immediately called Cornelius, claiming that "a terrible mistake had been made."

Much of the trial was devoted to evidence about the meaning of the term "4MM." Reed's evidence was that "MM" meant either two thousand in Roman numerals or millimeter. Monarch's evidence showed that "MM," by custom and usage in the label trade, meant one million.

Most of the problems in this case are resolved by the jury findings that the term "MM" by custom and usage in the trade means one million; Monarch's method of shipping was in substantial compliance with the purchase order; the reasonable value of the labels shipped to Reed's was $2,680, and reasonable attorney fees for representing Monarch were $750. The jury refused to find that Monarch knew that the order for "4MM" labels was a mistake. The court of civil appeals reversed the judgment of the trial court and remanded the cause for trial by reason of that court's refusal to submit an issue which inquired whether Monarch should have known of Reed's error in preparing the purchase order. Monarch urges that this holding of the court of civil appeals is immaterial because Monarch cannot now be placed in status quo, which according to the rule expressed in James T. Taylor and Son, Inc. v. Arlington I.S.D., 160 Tex. 617, 335 S.W.2d 371 (1960), must be proved as a basis for the rescission of a contract.

■ The mistake was a unilateral one; it was made by Reed's, and Monarch fully performed its part of the contract. The Texas rule has long been that relief from a unilateral mistake depends upon the ability of the party mistaken to put the other party into the same situation as he was

prior to the transaction in question. Kesler v. Zimmerschitte, 1 Tex. 50, 50–56 (1846). We reaffirmed that principle in James T. Taylor and Son, Inc. v. Arlington I.S.D., *supra*, wherein we said that one of the usual prerequisites to the granting of relief for a unilateral mistake was "(4) the parties can be placed in status quo in the equity sense, i. e., rescission must not result in prejudice to the other party except for the loss of his bargain." The importance of the ability to restore the status quo was emphasized in James T. Taylor and Son, Inc. v. Arlington I.S.D, *supra,* by our comments about Clem Lumber Co. v. Marty, 26 S.W.2d 319 (Tex.Civ.App.1930, writ ref'd). Clem Lumber Company was not entitled to the equitable relief of rescission of its bid to furnish materials because the offeree had already used some of the materials, had purchased a lot and had entered into a contract to build a building.

The treatise writers appear to be in accord with this reasoning. Professor Corbin states,

> It is frequently said, also, that rescission will be denied to one who has negligently made a mistake, if the other party was innocent and has materially changed his position. It is better to say, however, that such relief will be denied unless the other party is put in statu quo. 3 A. CORBIN, CORBIN ON CONTRACTS § 606, at 649–650 (1960). See also § 608, at 672; § 610, at 696.

Professor Williston says that "whatever equity there may be in favor of one who has made a unilateral mistake in the formation of a bilateral contract, the effect of it is confined to cases where the transaction is still wholly executory." 13 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1580, at 528 (3d ed. 1970). See also § 1578, at 506–507; § 1579, at 523.

We have in this case a fully executed contract on the part of Monarch and the record is devoid of proof of any effort on the part of Reed's to restore Monarch to the status quo even to the extent that circumstances would permit. See McDonald v. Simons, 280 S.W. 571 (Tex.Com.App.1926); Cator v. Commonwealth Bonding & Casualty Ins. Co., 216 S.W. 140 (Tex.Com.App.1919). Accordingly, the judgment of the court of civil appeals is reversed and the judgment of the trial court is affirmed.