AMERICAN NATIONAL INSURANCE
COMPANY, Appellant,

v.

GIFFORD–HILL & COMPANY,
INC., Appellee.

No. 05–82–01342–CV.

Court of Appeals of Texas,
Dallas.

April 19, 1984.

Rehearing Denied June 20, 1984.

Thomas W. McQuage, Galveston, for appellant.

M.D. Sampels, Richard L. Adams, Dallas, for appellee.

Before GUITTARD, C.J., and AKIN and ROWE, JJ.

GUITTARD, Chief Justice.

American National Insurance Company sued Gifford-Hill & Company, Inc., for a prepayment premium allegedly due on a promissory note because of premature payment of the entire balance of principal and accrued interest. Gifford-Hill denied that the written loan agreement between the parties required a prepayment premium under the circumstances. Gifford-Hill also pleaded an accord and satisfaction and discharge of the note by cancellation and surrender. Both parties moved for summary judgment. The trial court overruled American National's motion and rendered judgment for Gifford-Hill denying the relief sought. We hold that the agreement requires payment of the premium, but that a fact issue is raised concerning accord and satisfaction. Accordingly, we reverse and render a partial summary judgment interpreting the contract and remand for trial of the accord and satisfaction issue.

## 1. Interpretation of Loan Agreement

The principal question turns on interpretation of a loan agreement made as the result of a private placement financing. Gifford-Hill borrowed $5,640,000 from American National, and, as part of the same transaction, borrowed the same amount from Southwestern Life Insurance Company and $26,000,000 from The Prudential Insurance Company of America. Identical agreements were signed with the three lenders. All notes mature in 1994, but section 4 of the agreement requires annual installment payments, referred to as "required prepayments." Besides these required payments, paragraph 4D of the agreement permits "optional prepayments" with specified additional amounts as premiums. The issue is whether the prepayment made by Gifford-Hill on December 28, 1979, was an "optional prepayment" requiring payment of a premium under paragraph 4D. Gifford-Hill contends that this prepayment was not optional because a similar payment was made to Southwestern and paragraph 4F requires that if prepayment is made to any noteholder, proportionate payments must be made to the other noteholders as well.

Paragraph 6C(a) limits the amount of other debt that Gifford-Hill is permitted to incur. The prepayments to Southwestern and American National were prompted by Gifford-Hill's proposal to borrow more than two hundred million dollars for acquisition of the common stock of Amcord, Inc. In order to proceed with this acquisition, Gifford-Hill obtained the written consent of Prudential in consideration of an increase in the rate of interest on Prudential's note. Prudential also consented to the payment by Gifford-Hill of the other notes in question without corresponding payment on Prudential's note. From Southwestern, Gifford-Hill obtained an agreement to accept payment of all principal and accrued interest on Southwestern's note without the prepayment premium.

American National declined, however, to consent to the Amcord acquisition or to accept prepayment of its note without the

payment of the premium provided by paragraph 4D. In a letter to Gifford-Hill dated December 27, 1979, American National specified the amount of principal, interest, and prepayment premium it would require to discharge its note. On December 28, Gifford-Hill paid to Southwestern the amount of the principal and interest on its note and also wired to First City National Bank of Houston for deposit in American National's account the amount of the specified principal and interest on its note, but did not include the prepayment premium. Upon receiving notice of the deposit, American National's employees marked the note paid and returned it to Gifford-Hill. Later American National's vice-president discovered that the premium had not been paid. American National then demanded payment of the premium, Gifford-Hill declined, and this suit ensued.

Since our decision turns on our interpretation of the loan agreement, we have studied its provisions, which are written in the obscure jargon favored by some securities lawyers. Our first task in discovering the parties' intention has been to translate the pertinent provision into ordinary English. The crucial provision is paragraph 4D, which provides as follows:

4D. Optional Prepayment in Whole or in Part with Premium. The Notes shall be subject to prepayment, in whole or from time to time in part (in multiples of $1,000), at the option of the Company, on any interest payment date, at the following applicable percentage of the principal amount so prepaid: If prepaid during the 12 months' period ending on December 31,

[The schedule of percentages inserted here shows 107.90% applicable to prepayments in 1979.]

provided, however, that (i) the Company may not make any prepayment of the Notes in part pursuant to this paragraph 4D at any time when it has outstanding Debt (other than the Notes) which can by its terms be prepaid; (ii) the Company may not make any prepayment of the Notes pursuant to this paragraph 4D prior to December 31, 1983 as a part of a

refunding or anticipated refunding operation by the application, directly or indirectly, of borrowed funds either (x) having an interest rate or an interest cost to the Company (computed in accordance with accepted financial practice) of less than 8 ¾% per annum, or (y) evidenced by obligations having a maturity date earlier than the maturity date of the Notes or having an average life to maturity less than the average life to maturity of the Notes at such time, and (iii) the Company shall have delivered to you an Officer's Certificate as to compliance with clauses (i) and (ii) of this proviso and, if such prepayment is a prepayment in part, to the effect that the prepayment will not reduce Consolidated Working Capital below an amount which is considered adequate by the officers of the Company for the safe conduct of the business of the Company and its Subsidiaries without the necessity of creating additional Funded or Current Debt to replace funds used to make such prepayment.

As best we can determine, the meaning of this paragraph may be stated as follows:

4D Optional Prepayment in Whole or in Part with Premium.

The Company shall have the privilege of prepaying the principal amount in whole or in part on any interest payment date if the requirements of this paragraph are met. Partial prepayment must be in multiples of $1,000. Any optional prepayment shall include a premium, which, when added to the principal, shall amount to the percentage of the principal stated in the following schedule for the years specified: [107.90% for the year 1979.] No prepayment, however, may be made:

(i) when the Company has outstanding debt that can by its terms be prepaid, other than the notes specified in this agreement, or

(ii) before December 31, 1983, as a result of the use of borrowed funds having an interest rate less than 8¾% per annum or payable at an earlier aver-

age maturity date than the notes specified in this agreement.

Moreover, in order to exercise this privilege of prepayment, the Company must deliver to you an officer's certificate showing compliance with requirements (i) and (ii).

If only part of the principal is prepaid, the officer's certificate must also state that the prepayment will not reduce the Company's consolidated working capital below an amount considered adequate by its officers for the safe conduct of the business without additional borrowing to replace the funds used to make such repayments.

Gifford-Hill contends that the payment in question was not an optional prepayment within paragraph 4D because it was required by paragraph 4F, which provides, in part:

> 4F. Partial Prepayments.... [U]pon any partial prepayment of the Notes, the amount so prepaid shall be allocated to all Notes at the time outstanding in proportion to the original principal amounts thereof, but only in units of $1,000.... No optional prepayment pursuant to paragraph 4B or paragraph 4D shall be credited to or relieve the Company to any extent from its obligation thereafter, until the Notes shall be paid in full, to make required prepayments pursuant to paragraph 4A.

Gifford-Hill contends that since the prepayment to Southwestern was a "partial payment" in the sense that not all notes referred to in the agreement were being paid, a proportionate payment was required to American National, and would have been required also to Prudential but for Prudential's express waiver and consent. Consequently, Gifford-Hill argues, the payment to American National was not an optional prepayment within paragraph 4D.

We do not agree that paragraph 4F authorizes prepayments outside the scope of the other provisions of the note concerning optional prepayments. Instead, it applies expressly to optional prepayments under paragraphs 4B and 4D. Paragraph 4F, as

we understand it, does not require any prepayments. It gives Gifford-Hill the option to make prepayments proportionately to all noteholders or to make none at all. If Gifford-Hill decides to make an optional prepayment to one noteholder, the prepayments to the others are nonetheless optional prepayments governed by the other provisions of the agreement, including paragraph 4D.

The opposite interpretation proposed by Gifford-Hill would be contrary to the intent of the parties as expressed in the agreement. That interpretation would permit one noteholder to waive its prepayment premium, as Southwestern did here, and thus require the other noteholders to waive theirs also. According to Gifford-Hill, acceptance of any partial prepayment without a premium would require it to make a proportionate prepayment to the other noteholders, and such a prepayment would not require payment of the premium specified in paragraph 4D. This interpretation would permit Gifford-Hill, with the consent of only one noteholder, to change its obligation to the other holders. Our reading of the agreement as a whole indicates that no such result was intended. The general intent is expressed by Paragraph 11C, which specifically forbids any amendment to the agreement that would reduce the premium payable with respect to any note without the consent of all noteholders. In our view, nothing in paragraph 4F can be interpreted to permit Gifford-Hill to take any action with the concurrence of less than all the noteholders that would affect the premium payable to a non-concurring noteholder.

■ Gifford-Hill also contends that the payment to American National was not an optional prepayment within paragraph 4D because the conditions to prepayment provided in that paragraph were not met. We conclude that the conditions in paragraph 4D are conditions to the privilege of prepayment rather than conditions of liability for the premium and that Gifford-Hill, having made the payment, has no standing to object that the conditions were not met.

Those conditions were obviously inserted for the benefit of the noteholder rather than for the benefit of Gifford-Hill. Gifford-Hill could gain no advantage by limiting the circumstances under which it may exercise its privilege of prepayment. If Gifford-Hill decides that an optional prepayment would not be advantageous, it may simply elect not to exercise the privilege. On the other hand, the noteholders may have good reason not to accept an optional prepayment unless the conditions of paragraph 4D are met. Apparently, they are interested in keeping their funds invested, and, depending on the current interest rate, they may find an advantage in insisting on payment of the interest each year as it falls due. Consequently, they may have reason to object to Gifford-Hill's prepayment of their notes rather than Gifford-Hill's other outstanding debt. For similar reasons, the noteholders may have reason to object to a prepayment made with funds borrowed at a lower rate of interest than that provided in the notes in question. Moreover, if Gifford-Hill proposes a partial prepayment, the noteholders may be concerned about Gifford-Hill's financial responsibility and, therefore, may have reason to object to any partial prepayment that would impair Gifford-Hill's working capital. We have no difficulty, therefore, in construing the conditions in paragraph 4D as provisions for the benefit of the noteholders rather than for the benefit of Gifford-Hill. Consequently, we hold that Gifford-Hill has no standing to complain of nonperformance of any of these conditions. *Citizens National Bank v. Texas & P. Ry.*, 136 Tex. 333, 150 S.W.2d 1003, 1007 (1941); *Smith v. Nash*, 571 S.W.2d 372, 375 (Tex.Civ.App.—Texarkana 1978, no writ); *Lesikar Construction Co. v. Acoustex, Inc.*, 509 S.W.2d 877, 881 (Tex. Civ.App.—Fort Worth 1974, writ ref'd n.r. e.).

■ Gifford-Hill also argues that the prepayment in question was a required prepayment rather than an optional prepayment within paragraph 4D because its borrowing of funds to buy the Amcord stock constituted a breach of the agreement which was an "event of default" within paragraph 7 of the agreement, rendering it immediately liable for the principal of the note without liability for a prepayment premium. Without deciding whether liability for a prepayment premium may be avoided by Gifford-Hill's own breach of the agreement, we cannot agree that such a breach would necessarily have that result. Paragraph 7 does not provide for immediate liability for the principal balance in the event of default. Rather, it authorizes the holder, at its option, to accelerate the principal. The holder may elect to hold Gifford-Hill liable for each installment of interest until the note is finally paid. In that event, Gifford-Hill would have no privilege of prepayment other than as provided by paragraph 4D or some other applicable provision of the agreement. The summary-judgment proof shows no default or threatened default by Gifford-Hill and no declaration of default by any of the holders of the note. Southwestern merely advised Gifford-Hill that if Gifford-Hill should decide to proceed with the Amcord acquisition, it would accept prepayment of its note without the premium. We hold that this action could not affect Gifford-Hill's liability for the premium on the corresponding payment to American National.

■ Finally, Gifford-Hill argues that the payment to American National was a required rather than an optional prepayment because Gifford-Hill had committed itself to the Amcord acquisition, which would require borrowing in excess of the amount permitted by the loan agreement. This argument, also, is untenable. Even conceding that the agreement would require such a prepayment (and we do not so construe it), the Amcord acquisition was a matter within Gifford-Hill's control. If Gifford-Hill was required to make the prepayment because of the Amcord acquisition, the prepayment was nevertheless optional with Gifford-Hill, so far as American National was concerned, because it was Gifford-Hill's own decision to proceed with the Amcord acquisition that prompted its prepayment of the American National note. Gif-

ford-Hill could have avoided any prepayment to American National or to Southwestern by abandoning the Amcord transaction. Whether at some point Gifford-Hill assumed a binding obligation to other parties to proceed with its acquisition of Amcord does not affect the question of whether its payment to Gifford-Hill was required rather than optional within the meaning of those terms as used in its agreement with American National. We hold, for the reasons already stated, that the payment of December 28, 1979, was an optional prepayment within paragraph 4D. Accordingly, we reverse the summary judgment rendered by the trial court in favor of Gifford-Hill.

### Accord and Satisfaction

American National urges us to render judgment in its favor, contending that the trial court erred in overruling its motion for summary judgment for the amount of the premium, together with interest and attorney's fees because liability for the premium is established as a matter of law. Gifford-Hill replies that a fact issue is raised on its plea of accord and satisfaction. On this point we agree with Gifford-Hill.

The summary-judgment proof includes affidavits and extensive deposition testimony disclosing the following facts. Before Gifford-Hill paid the principal and accrued interest on December 28, 1979, Gifford-Hill had negotiated with American National, as well as with Prudential and Southwestern, concerning waiver of the prepayment premiums. In the course of the negotiations a meeting was held on December 12, 1979. The witnesses agree that at this meeting the representatives of Gifford-Hill requested that American National accept payment of the principal and accrued interest, without the premium, in full satisfaction of the note. Gifford-Hill's witnesses testified that they stated their opinion that no premium would be due on such payment. American National's witnesses denied that any question was raised concerning Gifford-Hill's liability for the premium. They

testified that Gifford-Hill admitted American National's right to require payment of the premium, but requested a waiver of that right. On December 26, Gifford-Hill inquired by telephone the exact amount of principal and interest American National claimed. American National replied by letter on December 27, stating the amounts of the principal, interest, and premium, aggregating $6,319,847.15, and directed that this amount be paid by wire transfer to its account in First City National Bank, Houston. This letter states: "After American National has received the funds, the Note will be returned to you marked Paid in Full."

The next day, December 28, Gifford-Hill made a wire transfer to the account specified in the amount of $5,874,287.16, which included the principal and interest without the premium. Accompanying this payment was a telegraphic "credit advice" message stating the amount of the payment and reading as follows:

FIRST CITY HOUS/FTB/AMERICAN NAT INS CO 12–1766–2 AS DEMONITES IN YOUR REQUIRED PREPAYMENT OF PRIN AND ACCURED INT ON NOTE 2–1–73 PLEASE ACKNOWLEDGE BY RETURNED CANCELED NOTE [sic].

This message was also conveyed to American National on the telephone by a bank employee. American National's employee in charge of the office that received this message was Jerry Pinkston. Pinkston had been instructed by David James, a securities analyst for American National, to let James know when the expected payment was made by Gifford-Hill. According to James, he had told Pinkston the exact amount expected. According to Pinkston, no amount was discussed. When Pinkston learned that the payment had been made, he advised James, or someone in James's office, but did not specify the amount. James then advised Steven Stubbs, American National's vice-president in charge of the securities department, that payment had been received from Gifford-Hill. Stubbs then directed James to write "Paid

in Full" on the face of the note and return it to Gifford-Hill with a letter acknowledging full payment. James did so. On January 21, Stubbs discovered that the full amount demanded in the letter of December 27 had not been paid. He then demanded that Gifford-Hill pay the difference, but Gifford-Hill refused.

Pinkston testified that his department never paid any attention to messages or credit advices, either written or by telephone, because it was not his job to determine the correctness of the amount. Contrary testimony concerning Pinkston's responsibility was given by James and Stubbs.

■ American National contends that this evidence shows as a matter of law that no fact issue is raised in support of Gifford-Hill's claims of accord and satisfaction because no communication was received from Gifford-Hill to the effect that the payment was contingent upon cancellation of the note. The law in this respect is declared in *Jenkins v. Henry C. Beck Co.*, 449 S.W.2d 454, 455 (Tex.1970), in which the supreme court held that the defense of accord and satisfaction rests on a new contract, express or implied, in which the parties agree to the discharge of the existing obligation by means of a lesser payment tendered and accepted. However, according to the supreme court, there must be an unmistakable communication to the creditor that the tender is made on the condition that acceptance will constitute satisfaction of the underlying obligation, and the statement accompanying tender of a sum less than the contract amount must be so clear, full, and explicit that it is not susceptible of any other interpretation. *Id.* at 455. In accordance with this standard, we hold that a fact issue is raised. The telegraphic "credit advice" is garbled in some respects, but it apparently refers to the amount of principal and interest demanded by American National. It does not expressly state that the payment is contingent on discharge of the note, but it does request that the payment be acknowledged by return and cancellation of the note. We conclude that a question of fact is raised as to whether under all the circumstances the tender was so clearly contingent on discharge of the note that acceptance of the payment and cancellation and return of the note establishes a new contract discharging the note.

■ Nor do we agree with American National that Gifford-Hill's defense of accord and satisfaction has been negated as a matter of law by summary-judgment proof that cancellation and return of the note resulted from a mistake of fact. The only evidence of mistake is the testimony of American's own employees, which is not free from contradictions. They did not agree on the instructions given to Pinkston concerning the amount of the expected payment or on Pinkston's responsibility to determine whether the proper amount was paid. Their testimony, if untrue, was not subject to rebuttal. At best, it only raised a fact issue. *Arlington Independent School District v. James T. Taylor & Son*, 354 S.W.2d 618 (Tex.Civ.App.—Fort Worth 1962, writ ref'd n.r.e.); *see Lewisville State Bank v. Blanton*, 525 S.W.2d 696 (Tex. 1975); *Great American Reserve Insurance Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 46–47 (Tex.1965).

■ Moreover, the mistake, if any, was unilateral. There was no evidence of any mistake on the part of Gifford-Hill. Under circumstances somewhat different, the supreme court has held that a unilateral mistake in computing the payoff figure on a note afforded no basis for avoiding an accord and satisfaction. *Neeley v. Southwestern Investment Co.*, 430 S.W.2d 465, 469 (Tex.1968). The supreme court has also held that relief from a unilateral mistake depends upon the ability of the party mistaken to put the other party into the situation he was in before the transaction in question. *Monarch Marking System Co. v. Reed's Photo Mark, Inc.*, 485 S.W.2d 905, 906–07 (Tex.1972); *James T. Taylor & Son v. Arlington Independent School District*, 160 Tex. 617, 335 S.W.2d 371, 373 (1960). Moreover, when the true amount of the debt is not in dispute, relief may be granted for a unilateral mistake of the

creditor in accepting an underpayment or of the debtor in making an overpayment. *Charlie Thomas Courtesy Ford, Inc. v. Sid Murray Agency,* 517 S.W.2d 869, 874–75 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.); *Benson v. Travelers Ins. Co.,* 464 S.W.2d 709, 712 (Tex.Civ.App.—Dallas 1971, no writ). The evidence here shows that American National notified Gifford-Hill of the deficiency in the payment only three weeks later, and there is no evidence that Gifford-Hill changed its position in reliance on the alleged accord and satisfaction. American had no duty to return the money to Gifford-Hill because, as Gifford-Hill concedes, at least the principal and interest were due under the loan agreement because of Gifford-Hill's contemporaneous payment to Southwestern. The evidence, however, does no more than raise a fact issue on this point.

■ American National asserts further that Gifford-Hill tricked American National into cancelling and returning the note by transferring into American National's designated account in response to American National's letter of December 27 only the principal and interest stated in the letter. We recognize that knowledge by one party that the other is acting under a mistake of fact is equivalent to a mutual mistake. *Ace Drug Marts v. Sterling,* 502 S.W.2d 935, 939–40 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.). However, we need not determine whether a fact issue is raised in this respect. We hold only that such a mistake is not established as a matter of law.

■ American National cites cases holding that an error in calculating the balance due on a note prevents its cancellation and surrender from operating as a discharge. *Gibraltar Savings Association v. Watson,* 624 S.W.2d 650, 652–54 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ); *Rhea v. Smith,* 462 S.W.2d 78, 80 (Tex.Civ.App.—Beaumont 1971, writ ref'd n.r.e.). We are not satisfied that this rule applies when a tender is conditioned on acceptance in full payment of the debt unless the requirements are met for equitable relief from a unilateral mistake. On this point, for reasons already given, we hold that no more than a fact issue is raised. Consequently, the trial court did not err in overruling American National's motion for summary judgment.

### Judicial Notice of Foreign Law

By cross-point Gifford-Hill contends that the trial court erred in denying its motion to take judicial notice of New Jersey law. The loan agreement provides that it shall be construed and enforced in accordance with the law of New Jersey. Gifford-Hill argues that the choice of law provision bears a reasonable relationship to the contract between the parties. We need not consider this point because Gifford-Hill has failed to demonstrate by the New Jersey authorities cited that the law of New Jersey differs from the law of Texas in any material respect.

### Judgment

For the reasons above stated, the summary judgment in favor of Gifford-Hill is reversed and partial summary judgment is rendered to the effect that the prepayment penalty provided by paragraph 4D of the loan agreement was due to American National on its payment of the principal and interest in the note on December 28, 1979, subject to Gifford-Hill's plea of accord and satisfaction and American National's plea of mistake. On these issues, and on the issues of prejudgment interest and attorney's fees, the case is remanded for trial. Costs are assessed against Gifford-Hill.

Reversed and rendered in part and reversed and remanded in part.