Joann M. SEYMOUR, Individually and as Trustee of the Seymour Family Life Insurance Trust, and as Independent Executrix of the Estate of John Thomas Seymour, Deceased, and as Next Friend of Crystal Marie Seymour; Steven J. Seymour, Individually and as Trustee of the Seymour Family Life Insurance Trust; Cynthia Rose Seymour; and Dale Anthony Seymour, Appellants,

v.

AMERICAN ENGINE & GRINDING COMPANY and Gilbert Turner, Appellees.

No. 14–95–00238–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 1, 1996.

Rehearing Overruled Feb. 27, 1997.

Maron D. Strother, Houston, for appellants.

Allen B. Daniels, Houston, for appellees.

Before MURPHY, C.J., and AMIDEI and ANDERSON, JJ.

## OPINION

MURPHY, Chief Justice.

This appeal results after a directed verdict in a declaratory judgment action filed by appellee, American Engine & Grinding Company, Inc. ("AE & G"), which sought to construe a stock purchase agreement ("the purchase agreement") funded by a "key man" life insurance policy on AE & G's employee, John Seymour ("Jack"). Appellants, the deceased employee's family members, appeal the trial court's denial of their counterclaim and cross-action. We affirm.

### Background

Gilbert Turner ("Turner"), also an appellee, founded AE & G, a small company whose business is manufacturing and rebuilding motors, in 1968 and has served as chairman of the board of directors since its incorporation. Jack began working in the shop in 1968 and by 1970 advanced to shop foreman. During the 1970s, Jack purchased 1100 shares of AE & G stock for $10 per share and 29 shares for $33 each. In 1990, Turner, who had been the majority shareholder, sold all but 100 shares of his stock in AE & G to AE & G and the company's Employee Stock Ownership Plan ("ESOP"), and retired as the company's president. After Turner's retirement, Jack was elected president, but Turner continued as chairman of the board. In addition to Jack's 1129 shares of AE & G stock, he had rights to 416 shares held by the ESOP Trust.

The corporate records reflect that the need for a stock purchase agreement for Jack's stock was discussed at the combination shareholders/directors meeting in March

1991. Turner and Jack were concerned about the corporation's ability to purchase Jack's shares in the event he died. Turner suggested obtaining "key man" life insurance on Jack, which would provide funds for the stock purchase under the purchase agreement. In July 1991, Jack and his wife, Joann, who also worked in AE & G's office, acquired a life insurance policy on Jack's life in the amount of $520,372 from Protective Life Insurance Company ("Protective") through its agent, Charles Haney. AE & G paid all premiums on the policy, which were $1,200 per month, or $14,400 per year. Turner testified he arrived at a requirement for $500,000 in life insurance based on the 1991 value of Jack's stock at over $200,000, the need to have the ability to fund purchase of the ESOP shares, and to provide protection to the company for the loss of a key man. He also expected the value of the company's stock to increase. Instead, according to the annual appraisals, the value declined.

Haney suggested the Seymours form a family insurance trust and referred them to an estate planning attorney, James Mulder. The life insurance policy was initially issued in the name of the Seymours' son, Steven, who was to become the trustee of the family trust. The policy's original beneficiary was the trustee under Jack's will. However, Steven assigned the policy to the Seymour Family Life Insurance Trust ("the trust"), and the trust was named beneficiary. In addition to preparing the trust, Mulder prepared a "split-dollar" agreement, which provided that upon Jack's death, AE & G would be reimbursed for its premium payments, but the remainder of the insurance proceeds would be paid to the trust. Steven executed the agreement as trustee, and Jack executed it both on his own behalf and on behalf of AE & G. Jack and Joann did not discuss the "split-dollar" agreement with Turner before its execution.

When Turner learned in September 1991 that the trust was named as beneficiary of

Jack's life insurance policy, he told Jack that AE & G needed to be the owner and beneficiary of the policy to have the necessary funds to purchase Jack's shares. On September 30, 1991, Steven, as trustee, executed an assignment to AE & G, which was submitted to and acknowledged by Protective. AE & G then remained the owner and beneficiary of the policy thereafter. On October 1, 1991, the purchase agreement between AE & G and Jack, joined by his wife, Joann, was executed. The agreement provided that on Jack's death, all of his shares would be purchased by the corporation and specified a formula for calculating the price per share based on the price at which the shares were most recently appraised. It further provided that proceeds from any life insurance policy of which AE & G was the beneficiary would be used to pay the purchase price of the stock.

Jack died on May 21, 1994. After Jack's death, Joann denied any knowledge of the purchase agreement and claimed the trust owned the insurance proceeds. By letter dated June 21, 1994, AE & G informed Joann it would purchase Jack's shares, including those in the ESOP, for $122.01 per share in accordance with the purchase agreement. The total price for Jack's shares, including his ESOP shares, according to the purchase agreement's formula, was $188,501.29.[1] AE & G notified Joann of the closing date for the stock purchase, but she did not attend. Instead, Joann notified AE & G and Turner that she, as majority shareholder, intended to call a special shareholders meeting to elect a new board of directors. Following Joann's refusal to honor the purchase agreement and the trust's claim for the policy proceeds, AE & G filed this suit for declaratory relief. Protective interplead the insurance funds into the registry of the court and was dismissed from the action. Appellants filed a counterclaim and cross-action against AE & G and Turner.[2] The Seymours alleged nu-

---

**1.** Although appellants argued in the trial court that appellees incorrectly valued Jack's stock, they have not brought a point of error complaining about the valuation. Therefore, we do not reach that issue.

**2.** In addition to Joann, the four Seymour children are parties to this action. Joann M. Seymour appeared individually and as Trustee of the Seymour Family Life Insurance Trust, as Independent Executrix of the Estate of John Thomas Seymour, Deceased, and as Next Friend of Crys-

merous causes of action, including breach of contract, fraud, negligent misrepresentation, mutual or unilateral mistake, breach of confidential relationship and constructive trust in their counterclaim and cross-action. They contend appellees tricked them into transferring the ownership of the life insurance policy to AE & G and into naming AE & G beneficiary. They also contend appellees coerced or tricked Jack into signing the purchase agreement.

The trial court granted AE & G's requested declaratory relief, and the case proceeded to trial on the Seymours' counterclaim and cross-action. At the conclusion of the testimony, the trial court granted appellees' motion for directed verdict and entered a take-nothing judgment against the Seymours. The court also denied appellants' motion for partial directed verdict seeking to rescind the assignment of the insurance policy and impose a constructive trust on the policy proceeds. The trial court's judgment ordered and decreed that AE & G is the beneficiary of the life insurance policy at issue, that the purchase agreement is legally enforceable and binding, and that AE & G is entitled to specific performance of the agreement. From the trial court's take-nothing judgment on their counterclaim and cross-action, appellants bring this appeal, raising twenty-eight points of error.[3]

### Rule 601(b)

We first address appellants' contention that evidence was improperly excluded under the "Dead Man's Statute" because this evidence is central to many of appellants' other complaints. The trial court sustained appellees' objections to admission of Jack's uncorroborated statements to his son based on the "Dead Man's Statute," which provides in relevant part:

*In actions by or against executors,* administrators, or guardians, in which judgment may be rendered for or against them as such, *neither party shall be allowed to testify against the others as to any oral statement by the testator,* intestate or ward, unless that testimony to the oral statement is corroborated or unless the witness is called at trial to testify thereto by the opposite party; and the provisions of this article shall extend to and include all actions by or against the heirs or legal representatives of a decedent based in whole or in part on such oral statement.

TEX.R.CIV.EVID. 601(b) (emphasis added).

■ Admitting and excluding evidence are matters within the discretion of the trial court, and the court's decision is reviewed under an abuse of discretion standard. *Lyondell Petrochemical Co. v. Fluor Daniel, Inc.,* 888 S.W.2d 547, 550 (Tex.App.—Houston [1st Dist.] 1994, writ denied). To obtain reversal of a judgment based on error in the exclusion of evidence, appellants must show that the trial court's ruling was in error and that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *McCraw v. Maris,* 828 S.W.2d 756, 757 (Tex.1992).

■ In their points of error twenty-four and twenty-five, appellants complain the trial court erred in refusing to admit evidence of a statement made by Jack and offered to show an oral agreement between Steven as trustee and AE & G. According to appellants, AE & G, through Jack, promised that the insurance proceeds would be paid to Joann. This promise was uncorroborated by other testimony or documentation. Appellants made an offer of proof after the trial court sustained appellees' objections to testimony about this oral agreement. In his bill, Steven testified his dad told him the insurance money would go to his mother.[4]

---

tal Marie Seymour, their minor child. Steven J. Seymour, appeared individually and as Trustee of the Seymour Family Life Insurance Trust. The other two children, Cynthia Rose Seymour and Dale Anthony Seymour, also appeared in their individual capacities. Appellants are collectively referred to as "the Seymours."

3. Appellants do not raise any points of error specifically attacking the declaratory relief granted.

4. Steven had earlier testified that AE & G promised the insurance proceeds would go to his mother if he assigned the policy to AE & G. He clarified on cross-examination that by "AE & G," he meant his father in his capacity as president of the company, not Turner or the board of

We agree with appellants' assertion that the Dead Man's Statute is construed narrowly. *See Quitta v. Fossati,* 808 S.W.2d 636, 641 (Tex.App.—Corpus Christi 1991, writ denied); *Cain v. Whitlock,* 741 S.W.2d 528, 530 (Tex.App.—Houston [14th Dist.] 1987, no writ). We find, however, that the facts of this case satisfy the strict construction required for application of the rule.

Appellants first contend the Dead Man's Statute does not apply to these facts because the "lawsuit is between a trust and a corporation." Appellants assert that their counterclaims were brought by the trust, and Joann was only named a party in her capacity as executrix by appellees. The record reflects, however, that all appellants, including Joann as executrix, are named as Third–Party Plaintiffs in the Seymours' First Amended Counterclaim and Cross–Action.

In *Tramel v. Estate of Billings,* 699 S.W.2d 259, 263–64 (Tex.App.—San Antonio 1985, no writ), the San Antonio court held that Rule 601(b) did not apply in an interpleader action to determine whether the wife or the estate were entitled to proceeds of life insurance policies. The court held that the determining factor was the capacity in which the parties were sued. *Id.* at 263. Because the parties were not sued in the capacity of administrator or executor, but instead sought the proceeds only in their own right, the rule did not apply. *Id.* The court also noted that insurance proceeds are non-testamentary. *Id.* at 264.

Even though life insurance proceeds are also at issue here, *Tramel* does not control this case. First, Joann is a party to this action in her capacity as executrix of Jack's estate. Rule 601(b) expressly provides that it is applicable in actions *"by or against executors."* (emphasis added). In addition, this suit was initially brought to enforce a contract between AE & G and Jack. The subject of the contract is the sale of Jack's shares, which passed through his estate to Joann. Joann, individually and as executrix,

was ordered in the judgment to sell the shares to AE & G. The judgment was necessarily rendered against Joann as executrix. Therefore, we hold the rule was properly applied to exclude the uncorroborated statement. We overrule points of error twenty-four and twenty-five.

### Counterclaim and Cross–Action

In their remaining points of error, appellants challenge the trial court's granting of appellees' motion for directed verdict, the court's denial of appellants' motion for partial directed verdict, and the court's denial of appellants' motion for new trial relating to the causes of action alleged in their counterclaim and cross-action. First, we address appellants' contest of the propriety of the directed verdict against them.

A directed verdict under Rule 301 of our Rules of Civil Procedure is proper when:

(1) a defect in the opponent's pleadings makes them insufficient to support a judgment;

(2) the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law; or

(3) the evidence offered on a cause of action is insufficient to raise an issue of fact.

*M.N. Dannenbaum, Inc. v. Brummerhop,* 840 S.W.2d 624, 629 (Tex.App.—Houston [14th Dist.] 1992, writ denied).

In reviewing the granting of a directed verdict by the trial court on an evidentiary basis, we will "determine whether there is any evidence of probative force to raise fact issues on the material questions presented." *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex. 1978). We consider the evidence in the light most favorable to the party against whom the verdict was directed and disregard all contrary evidence and inferences. *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983). All reasonable inferences are to be indulged in the non-movant's favor. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983). If there is any conflicting evi-

directors. This testimony, elicited by AE & G, does not constitute a waiver of the rule. A waiver does not occur when the opposite party merely cross-examines the witness at trial. *Lewis v. Foster,* 621 S.W.2d 400, 403 (Tex.1981)

(construing the predecessor to the rule, former Tex.Rev.Civ.Stat.Ann. art. 3716). As the trial court noted, AE & G carefully preserved its complaint as to any testimony of statements by the deceased.

dence of probative value on any theory of recovery, the issue is one for the jury, and an instructed verdict is improper. *White*, 651 S.W.2d at 262. When no evidence of probative force on an ultimate element exists, or when the probative force of slight testimony is so weak that only a mere surmise or suspicion is raised as to the evidence of essential facts, a directed verdict is proper. *Porterfield v. Brinegar*, 719 S.W.2d 558, 559 (Tex.1986).

■ In their points of error one and two, appellants attack the directed verdict on their breach of contract cause of action. The contract alleged to have been breached is an oral agreement between AE & G and the trust that the trust would receive all the proceeds of the life insurance policy. There is no evidence of such a contract. The only purported evidence was the uncorroborated testimony from Steven that his father made this promise on behalf of AE & G. This testimony was properly excluded under Rule 601(b), as discussed above.

■ Moreover, even if Jack had made such a promise, he had no authority to bind the company in the absence of approval by the Board of Directors. AE & G's by-laws stated that the president "may sign and execute in the name of the corporation all bonds, contracts or other obligations *authorized by the Board of Directors* . . ." (emphasis added). Appellants readily concede that Jack oversaw the day-to-day operations of the shop and Turner made all business decisions for the company. Turner conducted the board meetings and the board took the action he recommended. There is no evidence the board authorized this purported agreement. Instead, the purchase agreement is signed by three of the four directors of AE & G, evidencing the agreement between the corporation and Jack that the life insurance proceeds would be used to buy Jack's shares. Joann admitted at trial that Turner asked Jack to obtain the life insurance to cover the purchase of his shares of stock.

There is no evidence of probative value to support the existence of an oral contract, and therefore, there could be no breach. We overrule points of error one and two.

■ In their third and fourth points of error, appellants attack the directed verdict on their fraud claim. The Seymours claim Turner and AE & G fraudulently induced the execution of the purchase agreement. To prevail on a claim of fraud, they must establish the following elements: (1) appellees made a material representation; (2) the representation was false; (3) when the representation was made, appellees knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) appellees made the representation with the intent the Seymours would rely and act upon it; (5) the Seymours acted in reliance upon the representation; and (6) the Seymours thereby suffered damages. *See Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex.1990).

■ Appellants claim Turner testified the purchase agreement was prepared to ensure that Joann would receive the money for Jack's shares, when in truth, AE & G was not obligated under the agreement. The Seymours contend that the purchase agreement was merely an option contract. In paragraph seven, the purchase agreement provided that AE & G was not required to purchase Jack's shares in the event he was uninsurable, which was defined as occurring when the premium cost was over 2% of the coverage. Jack's premiums were over 2% of the face amount of the policy, but AE & G did not enforce this provision. It paid the premiums and attempted to honor its obligation to purchase Jack's shares. Turner testified he never intended to rely on the uninsurability provision in paragraph seven. The Seymours did not plead that AE & G invoked paragraph seven or in any way breached the purchase agreement. Furthermore, appellants were not harmed by any reliance on Turner's representation to them. AE & G attempted to honor the agreement and comply with Turner's representation that the purchase agreement would be used to buy Jack's shares from Joann. Based on these facts, we conclude any claim that Turner represented the agreement was binding instead of an option contract cannot form the basis of appellants' fraud claim.

■ Appellants also contend Turner misrepresented that the purchase agreement was in Jack's best interest. While appellants might have preferred that AE & G purchase the policy as a benefit of Jack's employment with all the proceeds paid to Joann or the trust, there was no obligation for AE & G to be so generous. Turner testified that the plan under the split-dollar agreement, to which he never consented, would have been the equivalent of a 40% raise for Jack. It cannot be said that the purchase agreement was not in Jack's best interest. If AE & G did not purchase the stock under the agreement after Jack's death, testimony showed the company would have no obligation to purchase the shares, there likely would be no buyer, and Joann would receive no money for the shares she owned through Jack's employment. Instead, under the purchase agreement, Joann would receive $188,501.29.

■ Appellants claim Turner fraudulently concealed that Jack was a majority owner of AE & G. Jack owned 1129 of the 2849 outstanding shares, which equalled approximately 39% of the shares. When Jack's ESOP shares are added to the shares he owned outright, the total is more than 50% of the outstanding shares. However, the ESOP plan provides that these shares are owned by the ESOP trust and voting rights arise only if a sale or merger of the company is contemplated. Otherwise, it provides the employee only has voting rights if required by the employer's by-laws, through implementation of a "one-man, one-vote philosophy." AE & G's by-laws do not contain this prerequisite for voting rights under the ESOP. Appellants provided expert testimony from an attorney who had reviewed the ESOP that in his opinion, Jack could vote his ESOP shares. Even when we consider the evidence in the light most favorable to the Seymours and disregard the contrary evidence, appellants' fraud claim based on a misrepresentation by Turner on this issue cannot succeed. Appellants provided no evidence that this representation was known by Turner to be false when made or how any reliance by appellants caused them injury. There is no evidence Jack attempted to vote these shares or that his inability to vote these shares caused cor-

porate actions different than those he would have preferred.

■ Appellants also claim Turner and AE & G fraudulently obtained the assignment of the insurance policy. The corporate records reflect that purchase of the policy to provide funds for purchase of Jack's shares after his death was discussed at the March 1991 meeting. Joann admitted in her testimony that she understood that the purpose of the policy was to enable AE & G to have sufficient funds to buy Jack's shares. AE & G paid all the premiums. Before Turner requested the assignment he had no knowledge of the trust's existence or any contact with anyone regarding the trust. Charles Haney, the insurance agent, testified he advised Joann and Jack not to assign the policy to the company. He testified Joann was not happy about it, but Jack knew what he was doing. Turner was not present when the assignment was executed, and did not prepare the assignment. Thus, there is no evidence of a misrepresentation made by appellees to obtain the assignment.

Appellants rely on the split-dollar agreement as proof of their fraud claim. This agreement, to which Turner was not a party, cannot support a claim for misrepresentation. Turner testified he and AE & G were unaware of the agreement before the policy beneficiary was changed. Joann confirmed the split-dollar agreement was not discussed with Turner. Therefore, the corporation did not authorize its execution and Jack had no authority to bind the corporation to a contract without board approval.

Our review of the record reveals an absence of any probative evidence that Turner, on behalf of AE & G, knowingly or recklessly made any material misrepresentation to Jack or appellants upon which they relied to their detriment. We conclude there is no evidence supporting fraud and the trial court properly directed a verdict on this claim. Directed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled to judgment as a matter of law. *Wright v. General Motors Corp.*, 717 S.W.2d 153, 155 (Tex.App.— Houston [1st Dist.] 1986, no writ). We overrule points of error three and four.

In points of error five, six, nine and ten, appellants challenge the propriety of the directed verdict on their claims of unilateral or mutual mistake. They claim both the purchase agreement and the assignment should not be enforced because their execution was based on mistake.

A mistake by one party to an agreement, where it is not induced by the other party, will not be grounds for relief. *FDIC v. Graham*, 882 S.W.2d 890, 897 (Tex. App.—Houston [14th Dist.] 1994, no writ). To be entitled to equitable relief on the ground of unilateral mistake in a contract action, the complaining party must show: (1) the mistake was of so great a consequence that to enforce the contract as made would be unconscionable; (2) the mistake related to a material feature of the contract; (3) the mistake was made regardless of the exercise of ordinary care; and (4) the parties could be returned to the status quo such that rescission of the contract would not result in prejudice to the other party except for loss of bargain. *Hayes v. E.T.S. Enterprises, Inc.*, 809 S.W.2d 652, 658 (Tex.App.—Amarillo 1991, writ denied).

Under the doctrine of mutual mistake, when parties to an agreement have contracted under a misconception or ignorance of a material fact, the agreement will be avoided. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex.1990). To prove a mutual mistake, the evidence must show that both parties were acting under the same misunderstanding of the same material fact. *Lacy v. Ticor Title Ins. Co.*, 794 S.W.2d 781, 784 (Tex.App.—Dallas 1990), *writ denied per curiam*, 803 S.W.2d 265 (Tex.1991). Knowledge by one party that the other is acting under a mistake of fact is equivalent to a mutual mistake. *American Nat'l Ins. Co. v. Gifford–Hill & Co.*, 673 S.W.2d 915, 922 (Tex. App.—Dallas 1984, writ ref'd n.r.e.).

Appellants contend Turner was aware the Seymours were operating under the mistaken belief that the money from Jack's life insurance would eventually go to Joann. The only evidence in the record as to Turner's understanding shows that he intended, and believed Jack understood, that

Joann would receive money for her shares of stock from the life insurance proceeds. AE & G's intent is shown in the corporate records where the need for a stock purchase agreement was discussed at the March 1991 meeting. Turner testified he went over the purchase agreement in detail with Jack and was sure Jack understood it. Turner also testified the purpose of the life insurance policy was to fund the purchase agreement and permit AE & G to have sufficient funds to buy Jack's shares, his ESOP shares, and to compensate the company for loss of a key man. While Jack may not have contemplated that the appraised value of his shares would decrease after execution of the purchase agreement, there is no evidence he did not understand the agreement's formula for calculating the purchase price of his shares. Likewise, there is no evidence Turner knew of Jack's purported misunderstanding. Turner testified he had no reason to think Jack did not agree with the appraisal formula. Haney, the insurance agent, testified that he recommended the Seymours execute a buy-sell agreement specifying the face amount of the policy would be paid to Joann for Jack's shares after her death. This testimony is *not* evidence of the Seymours' understanding, however. We conclude there is no evidence either Turner or Jack did not understand the purchase agreement when it was executed. Therefore, the trial court properly directed a verdict as to unilateral or mutual mistake as to execution of the purchase agreement.

There is also no evidence Steven did not understand the assignment. He admitted he understood the consequences and effect of the assignment, that is, that it made AE & G the owner and beneficiary of the policy. Turner obviously understood the assignment, as he requested its execution. Haney testified the Seymours knew what they were doing when they executed the assignment, but that Joann was unhappy about it. Finding no evidence of mistake by either party, we overrule points of error five, six, nine and ten.

Appellants challenge the directed verdict granted on their claim of negligent misrepresentation in points of error seven

and eight. The elements of a cause of action for negligent misrepresentation are: (1) a representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

 The basis of appellants' negligent misrepresentation claim, according to the argument in their brief, is a statement by Jack to Steven that if he executed the assignment, the funds would eventually go to Joann after they "filtered through the corporation." There is no evidence of such a misrepresentation in the record because any testimony of this nature was properly excluded under the Dead Man's Statute and offered only in appellants' bill. Moreover, there is no evidence that Jack's statement, if admitted, should be imputed to Turner or AE & G. Therefore, we overrule points of error seven and eight.

 In their eleventh and twelfth points of error, appellants contend that the trial court improperly directed a verdict on their claim of undue influence. For there to be undue influence in the execution of an instrument, there must be such dominion and control exercised over the mind of the person executing the instrument as to overcome his free agency and free will, and to substitute the will of another so as to cause him to do what he would not otherwise have done but for such dominion and control. *Bailey v. Arlington Bank & Trust Co.*, 693 S.W.2d 787, 789 (Tex.App.—Fort Worth 1985, no writ).

 Appellants contend Turner dominated and controlled Jack so as to overcome his free will, yet they merely cite evidence of the control Turner exercised over the company. For example, Turner presided over all board meetings, and Turner co-signed all company checks. Even though Jack was president and both Jack and Joann were signatories on the account, Turner would not permit Jack and Joann to sign the same check. Joann testified Turner decided Jack's salary and raises. Appellants also cite to testimony that Turner allowed his other companies to benefit from doing business with AE & G, and AE & G was less profitable as a result.

The testimony cited by appellants to show that Turner controlled Jack must be considered in the context of the longstanding employment relationship between Jack and Turner. In our review of the evidence, the reasonableness of an inference that may be drawn from evidence must be evaluated in light of all facts and circumstances, including those circumstances in derogation of that inference. *Simmons & Simmons Constr. Co. v. Rea*, 155 Tex. 353, 286 S.W.2d 415, 419 (1955). Joann testified Turner was Jack's boss. She testified Jack did not do anything against Turner's will or disobey him. Jack made the business decisions in the shop, but Turner decided the legal dealings of the corporation. This evidence equally supports an inference that Jack merely followed directions from his employer rather than being subject to his dominion and control against his will. When circumstances are consistent with either of two facts, and nothing shows that one is more probable than another, neither fact can be inferred. *$56,700 in U.S. Currency v. State*, 730 S.W.2d 659, 660 (Tex. 1987). We hold this testimony of the business relationship between Jack and Turner is insufficient as a matter of law to permit an inference that Turner exercised undue influence over Jack. We overrule points of error eleven and twelve.

In their points of error thirteen and fourteen, appellants challenge the directed verdict on their claims of breach of a fiduciary or confidential relationship. Although the existence of a confidential relationship is ordinarily a question of fact, when the issue is one of no evidence, it becomes a question of law. *Crim Truck & Tractor Co. v. Navistar Internat'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex.1992).

 The law recognizes the existence of a confidential relationship in those cases "in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Texas Bank & Trust Co. v.*

*Moore,* 595 S.W.2d 502, 507 (Tex.1980). A confidential relationship giving rise to an informal fiduciary relationship would impose a duty on Turner to put the Seymours' interests ahead of his own. *See Crim Truck,* 823 S.W.2d at 594.

 However, the general rule is that a party to a contract is free to pursue his own interests, even if it results in a breach of that contract, without incurring tort liability. *See Amoco Production Co. v. Alexander,* 622 S.W.2d 563, 571 (Tex.1981). The fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship. *Crim Truck,* 823 S.W.2d at 594. Every contract includes an element of confidence and trust that each party will faithfully perform his obligation under the contract. The fact that the relationship has been a cordial one, of long duration, is not evidence of a confidential relationship. *Id.* at 595.

 The evidence showed Jack and Turner respected one another. They each relied on the other to perform their respective duties at AE & G. Mere subjective trust alone is not enough to transform arms-length dealings into a fiduciary relationship. *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex. 1962). In addition, Texas does not recognize a general duty of good faith and fair dealing in an employment relationship. *Palmer v. Miller Brewing Co.,* 852 S.W.2d 57, 63 (Tex. App.—Fort Worth 1993, writ denied); *see also Crim Truck,* 823 S.W.2d at 593–94 n. 3 (recognizing that a fiduciary duty contemplates fair dealing and good faith). We hold the evidence in our record is insufficient to create a confidential relationship as a matter of law. Therefore, we overrule points of error thirteen and fourteen.

 In point of error nineteen, appellants challenge the directed verdict on their claim for exemplary damages. There can be no recovery for exemplary damages in the absence of actual damages. *Doubleday & Co., Inc. v. Rogers,* 674 S.W.2d 751, 753–54 (Tex. 1984). As we have found the directed verdict proper on all grounds which would have entitled appellants to actual damages, there is no

basis for exemplary damages. We overrule point of error nineteen.

Appellants' remaining claims concern the validity of Steven's assignment of the life insurance policy to AE & G. First, in points of error seventeen, twenty, twenty-two, and twenty-seven, appellants challenge the trial court's denial of their motion for partial directed verdict seeking to declare the assignment of the policy invalid and imposing a constructive trust on the proceeds. We review the denial of a directed verdict by considering all the evidence in the light most favorable to the nonmovants, disregarding all evidence to the contrary, and resolving all reasonable inferences in favor of the nonmovants. *Harris County v. Demny,* 886 S.W.2d 330, 333 (Tex.App.—Houston [1st Dist.] 1994, writ denied). Appellants must show that the record contains evidence establishing the movant's position as a matter of law. *Kershner v. State Bar of Tex.,* 879 S.W.2d 343, 346 (Tex.App.—Houston [14th Dist.] 1994, writ denied). Consequently, we affirm the trial court's ruling if the record contains more than a scintilla of evidence contrary to the movant's position. *Id.*

Appellants contend in points twenty-two and twenty-three that the trial court erred in overruling their motions for partial directed verdict and for new trial because the assignment was not supported by consideration. We disagree.

Appellants refer to article 10.02 of the trust document, which states the trustee shall not have the power to "dispose of any part or all of the principal or income of any trust estate for less than adequate and full consideration in money or money's worth." They claim they have the right to sue for the recovery of the trust property which was transferred without consideration in breach of trust.

 "Consideration," a fundamental element of all contracts, may consist of either a benefit to the promisor or a detriment to the promisee. *Shell Pipeline Corp. v. Coastal States Trading, Inc.,* 788 S.W.2d 837, 844 (Tex.App.—Houston [1st Dist.] 1990, writ denied). There is more than a scintilla of evidence in our record to sustain a finding by the trial court that the assignment is supported by valuable consideration. First, all

premiums for the policy were paid by AE & G. In addition, Turner testified that he gave "the promise to Jack that they would use the funds to the extent necessary to purchase his stock" in exchange for the assignment. Therefore, the trial court properly denied appellants' motion for partial directed verdict and motion for new trial on this ground. We overrule points of error twenty-two and twenty-three.

Appellants argue in points fifteen through eighteen that the terms of the trust did not permit or authorize Steven as trustee to execute the assignment to AE & G. However, the trust document expressly states:

The insurance companies which have issued such policies are hereby authorized and directed to recognize the Trustee as the absolute owner of such policies of insurance and as being fully entitled to all options, rights, privileges and interest under such policies, and any receipts, releases and *instruments executed by the Trustee in connection with such policies shall be binding and conclusive upon the insurance companies and upon all persons interested in any trust created by this trust instrument.* (emphasis added).

Therefore, according to the express terms of the trust document, the assignment is binding as to Protective and interested third parties. Protective, AE & G and Turner were entitled to rely on an assignment executed by Steven as trustee.

In addition, the split-dollar agreement, executed by Steven and Jack and which appellants claimed was in force while Steven owned the policy as trustee, provided that the "Trustee shall have all incidents of ownership in the Policy including, but not limited to, borrowing, *assigning its rights in the Policy, designating beneficiaries and changing designations of beneficiaries,* exercising settlement options, etc." (emphasis added). Thus, it is apparent Jack and Steven agreed that the *trustee had the authority to assign* the policy as one of the "incidents of ownership." We overrule points of error fifteen, sixteen, seventeen, and eighteen.

In points twenty and twenty-one, appellants contend the beneficiaries did not authorize the assignment of the life insurance policy. Appellants provide no authority

whatsoever under these points to show the beneficiaries must authorize the trustee's actions under these facts.

In their point of error twenty-six, appellants complain they were not permitted to testify that they did not authorize the trustee to assign the insurance policy. The court sustained appellees' objection on relevance grounds, and appellants made an offer of proof of testimony from Jack's children. As noted earlier, appellant must demonstrate that exclusion of evidence was in error and also that it probably led to the rendition of an improper judgment. *See McCraw,* 828 S.W.2d at 757. Appellants' single-paragraph argument, without citation to authority, does not explain how this evidence is relevant to any cause of action against AE & G or Turner, as opposed to a claim the beneficiaries of the trust might have against the trustee for exceeding his authority. Without argument and citation of authority, appellants' points of error are waived. *See Trenholm,* 646 S.W.2d at 934. We overrule points of error twenty, twenty-one, and twenty-six.

In points twenty-seven and twenty-eight, appellants argue the trial court erred in denying their motions for partial directed verdict and for new trial on their request for imposition of a constructive trust. First, before a constructive trust may be imposed, there generally must be a prior confidential relationship. *Rankin v. Naftalis,* 557 S.W.2d 940, 944 (Tex.1977); *Hamblet v. Coveney,* 714 S.W.2d 126, 128 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). Fraud, actual or constructive, is also an essential element in the creation or existence of a constructive trust. *Id.* at 131. Having found no evidence of fraud or of a fiduciary or confidential relationship, we hold that the trial court correctly denied appellants' motion for partial directed verdict on their request for imposition of a constructive trust. We overrule points of error twenty-seven and twenty-eight.

In conclusion, having sustained none of appellants' points of error, we affirm the judgment of the trial court.